**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| | **:** | |
| **v.** | **:** | **CRIMINAL ACTION FILE NO.** |
| | **:** | **1:13-CR-287-TCB-AJB** |
| **FRANKLIN LATIMORE,** | **:** | |
| | **:** | |
| **Defendant.** | **:** | |

**UNITED STATES MAGISTRATE JUDGE'S
<u>FINAL REPORT AND RECOMMENDATION</u>**

Before the Court are Defendant Franklin Latimore's Motion to Suppress Defendant's Alleged Statements and Physical Evidence Obtained Via Search Warrants, [Doc. 22], and Supplemental Motion to Suppress Statements and Physical Evidence Seized With and/or Without a Warrant, [Doc. 41]. The Court conducted an evidentiary hearing, [Doc. 57 (hereinafter "T__")], after which the parties filed briefs. [Docs. 69 & 75 (Government), 73 (Defendant)]. With briefing concluded, the motions are now ripe for recommended resolution. For the following reasons, the Count **RECOMMENDS** that the motions be **DENIED**.

# I.     Introduction

Latimore is charged in a superseding indictment with possession of firearms after having been convicted of felony offenses (Count One); possessing a machine gun (Count Two); possessing an unregistered firearm with a barrel length shorter than 16 inches (Count Three); and possessing ammunition and a firearm after having been convicted of felony offenses (Count Four).  [Doc. 44].  The offenses charged in Counts One, Two and Three are alleged to have occurred on March 26, 2013; the offense charged in Count Four is alleged to have occurred on July 18, 2013.  [*Id.*].

Latimore initially moved to suppress statements and evidence seized by warrant from 2954 Sugarcreek Lane, S.E., Atlanta, DeKalb County, Georgia, on March 26, 2013.  [Doc. 22].  In his supplemental motion, he moved to suppress the fruits of (1) a traffic stop on I-675 on March 4, 2013; (2) a federal seizure warrant dated March 19, 2013, which was executed on March 26, 2013, and which was followed by (3) a DeKalb County state search warrant issued and executed that same day; and (4) another state search warrant executed on July 18, 2013.  [Doc. 41].

In a telephone conference with counsel on December 9, 2013, the Court advised that, at the evidentiary hearing, Latimore could challenge the March 4, 2013, traffic stop of his Corvette and his purported consent to search the vehicle (which resulted in

2

the discovery of $105,860.00), even though the Government was not intending to introduce at trial the evidence seized following that stop, since law enforcement relied upon the fruits of that search in applying for and receiving the March 19, 2013, federal seizure warrant and the March 26, 2013, state search warrant.[1]  *See* Doc. 53; FTR Gold

---

[1]      The Government objected to Defendant's request for a hearing on the traffic stop because the Government was not seeking to introduce evidence of Defendant's alleged involvement in the drug business at Defendant's trial for firearms violations, and in any event, Defendant had made an inadequate showing under *Franks v. Delaware*, 438 U.S. 154 (1978), to obtain a hearing as to the traffic stop allegations that were included in the affidavits in support of the later-issued seizure and search warrants.  *See* Doc. 53; FTR Gold Recording 12/09/2013 @ 3:31 PM.

The Court  overruled these objections for two reasons.  First, a defendant may challenge the information contained in a search or seizure warrant affidavit that was arguably seized in violation of the Fourth Amendment.  *See United States v. Zarabogo*, 378 Fed. Appx. 939, 940 (11th Cir. May 10, 2010) ("If a search warrant is based on probable cause discovered because of an illegal search, generally the search warrant is tainted and the evidence obtained pursuant thereto is inadmissible.") (citing *United States v. McGough*, 412 F.3d 1232, 1240 (11th Cir. 2005)); *see also United States v. Chaves*, 169 F.3d 687, 692-92 (11th Cir. 1999) (holding that search by warrant following illegal warrantless search invalid unless other information in affidavit was sufficient to support finding of probable cause); *United States v. Gaultney*, 656 F.2d 109, 110 (5th Cir. 1981) (holding that any information obtained as a result of illegal warrantless  search could not form the basis for an affidavit for subsequent search warrant).  *Cf. United States v. Lockett*, 533 Fed. Appx. 957, 965-66 (11th Cir. Aug. 28, 2013) (discussing procedure in evaluating search warrants where affidavit is based on prior allegedly unlawful warrantless search).  Second, Latimore was not alleging a *Franks* violation, but only an illegal traffic stop, and therefore he did not have to satisfy *Franks*' substantial preliminary showing that a false statement made knowingly and intentionally, or with reckless disregard for the truth, was included by an affiant in a search warrant affidavit, and that the allegedly false statement was

3

Recording 12/09/2013 @ 3:31 PM. The Court also ruled that Defendant was entitled to a hearing on law enforcement's warrantless observations that were contained in the affidavit in support of the July 18, 2013, state search warrant. *Id.*[2]

The Court will address each search or seizure *in seriatim*.

## II.     March 4, 2013, traffic stop resulting in discovery of $105,860.00

### A.     Facts

On March 4, 2013, Georgia State Patrol ("GSP") Trooper Doug Allen[3] was on patrol in the northbound lanes of I-675 just south of I-285.  T6, 7.  Although Allen described his patrol as "normal," he also was a member of a criminal interdiction unit that worked with federal law enforcement task forces in drug investigations.  T5, 40. Allen had been advised by GSP Sergeant Chapeau, another member of the criminal

_____

necessary to the finding of probable cause.  *Franks*, 438 U.S. at 171-72.

[2]     The Court also ruled that Latimore had not shown what, if any, statements to law enforcement by his wife were subject to the marital privilege, and thus he was not entitled to a hearing on those statements.  Similarly, Latimore did not make a sufficient showing that he was the subject of a custodial interrogation when he spoke to the police telephonically while the police were executing the warrants at the Sugarcreek Lane residence on March 26, 2013, and thus he was not entitled to an evidentiary hearing as to those statements either.

[3]     At the time of the evidentiary hearing, Allen had been a GSP Trooper for five years.  He previously served as a police officer with the Covington (Ga.) Police Department for seven years.  T4, 5.

interdiction unit, to try and stop a 2013 Chevrolet Corvette driven by Defendant as part of a High Intensity Drug Trafficking Area (HIDTA) task force investigation of a residence in the vicinity of I-675 and Anvil Block Road. T6-7, 24. Allen admitted that his goal was to see if there was probable cause to pull the vehicle over, and then either to get consent to search it or develop additional probable cause to perform a non-consensual search. T33, 49. Although Allen testified on direct examination that he did not receive much background information on the underlying investigation, T7, he subsequently testified that once he was tasked with trying to stop the Corvette, he was able to listen to the Nextel radio communications between the narcotics investigators. T36. Then, on cross-examination, he acknowledged that his only reason for being on patrol at that location was to look for the Corvette; that he knew that the HIDTA agents were surveilling a house that was suspected to be involved in drugs and that the Corvette, which had been seen at the house, was surveilled by HIDTA agents for an hour until they observed Allen following it and then they backed off; and that he received real-time radio transmissions of the pre-stop surveillance of the Corvette, including that the drug agents were following Latimore, that he stopped at a house for a short time, that he went to a shopping center and waited, and that there was no report

from the HIDTA agents that they saw Latimore consume any alcoholic beverages. T41-44, 50.[4]

Just before 7:54 p.m., Allen began following the Corvette, which was traveling in the far left lane of northbound traffic on I-675. Allen described the traffic as medium. T13. Based on Allen's pacing, radar and GPS, Allen determined that the Corvette was traveling 78 miles per hour in a 65-miles-per-hour zone. T6, 7, 13, 48. As Allen followed the vehicle, he also concluded that the driver was not maintaining his lane of traffic, and as a result, Allen activated his dashboard video camera. T44-45; Govt. Ex. 1 (hereinafter "DVD"). Allen testified that after he activated the recorder, Latimore "failed to maintain his lane of traffic probably four or five times by drifting over the dotted white lines with his right wheels." T6; *see also* T45-48 (Allen testifying that the Corvette crossed the white dashed line at DVD 0:15-17, 0:21, and 0:28).

At DVD 0:58, after following the Corvette for about one mile, T6, 7, Allen turned on his blue lights and directed Latimore to stop. Latimore complied and came to a stop on the right hand shoulder of the highway. DVD 1:12; T8, 22.

---

[4]    Allen could not recall whether he was told by the HIDTA agents that Latimore had entered the house under surveillance. T65.

6

Allen approached the vehicle on the passenger side. T8. Latimore was the driver and Latisha Moss was in the passenger seat. T8. To speak with the Corvette's occupants, Allen stooped down and almost leaned into the vehicle, and told Latimore that he stopped him for speeding for going 78 miles per hour in a 65-miles-per-hour zone, and also for failing to maintain his lane of travel "a couple of times." T8; DVD 1:50-1:55. Although not audible on the videotape, Allen testified that he asked for Latimore's driver's license. T8; *see also* T53; DVD 2:06. Allen asked Latimore if he still lived on Hardee Street in Atlanta, and whether the vehicle was his. Allen is heard asking for the vehicle registration and insurance. DVD 1:56-2:05; T23. Allen testified that he smelled a slight odor of an alcoholic beverage coming from inside the car (although he did not observe any alcoholic beverage containers), and therefore he asked Latimore whether he had had anything to drink. DVD 2:11; T54. Allen also saw that Latimore's hand was trembling and shaking as Latimore handed his license to him. T8, 9, 23, 66.[5] Allen described Latimore as having "a heightened sense of nervousness that goes beyond just the soccer mom that's getting pulled over for speeding and somebody transporting large amounts of money." T66.

---

[5]     The DVD reflects approximately 45 seconds where Allen did not ask any questions while Latimore or Moss appear to be searching for the insurance card. DVD 2:11-2:53.

7

Sergeant Chapeau arrived on the scene approximately one minute after the initial stop, and GSP Trooper Kent arrived shortly after Chapeau.  T15.  All of the troopers were armed and in uniform, but none of them unholstered any weapons at any time during the encounter with Latimore.  T16.

Allen asked Latimore to step out of the Corvette, so that he could try to isolate the alcohol smell as coming either from Latimore or Moss.  T8-9, 23, 67; DVD 2:58.  Latimore exited the Corvette at approximately DVD 3:08.  *See also* T11.  Latimore and Allen stood behind the Corvette in front of Allen's vehicle (and the video camera on Allen's dashboard).  At no time after Latimore was asked to get out of the vehicle does he appear or sound to be visibly shaking or overly nervous.  *See* DVD.

Based on his encounter outside the Corvette, Allen concluded that since he did not smell any alcohol on Latimore, the smell of alcohol in the Corvette was not coming from him.  T11.  Allen asked Latimore where he was coming from, and Latimore responded that he came from home, and traveled down I-675 looking for a Ruby Tuesday's because he and Moss had a coupon, but since they could not find the restaurant, they went to get a pedicure.  T9-10; DVD 3:20-4:37.[6]  Allen testified that

---

[6]     Much of the recorded dialogue was difficult to hear due to the vehicles driving by the location of the traffic stop.  Even Allen described the audio as "terrible." T56.  It is more audible at lower volume.

8

Hardee Street (located in Atlanta) was between twenty and twenty-five minutes away from the location where the Corvette was stopped.  T24.  As a result of this portion of the encounter, Allen concluded that Latimore did not appear to be under the influence of either alcohol or drugs.  T11.

Allen then approached Moss (at DVD 4:41) to see if he could smell alcohol on her, and if so, to get her identification to see if she was of drinking age, and also to ask her where they were going.  T10, 11, 57.[7]  Once at the passenger side of the Corvette, Allen first asked Moss for her identification, DVD 4:42, followed by, "How do you know this guy?", DVD 4:53,[8] and finally asked her if she had been drinking. DVD 4:59. (Moss's response cannot be heard but it appears that she acknowledged that she had been drinking because Allen's barely audible response sounds to the Court as if her response confirmed his smelling of alcohol.)  Allen testified that he did not look

---

[7]     While Allen approached Moss, Chapeau approached and spoke to Latimore; however, the content of their conversation was not overheard by Allen's microphone and thus was not audibly captured on the recording.  T25; DVD 5:09.

[8]     Moss's response sounds to the Court like she stated that Latimore was a "personal friend."  DVD at 4:53.

AO 72A
(Rev.8/8
2)

at Moss's driver's license immediately to see how old she was. T57.[9]  Instead, Allen asked her about their travels.  In response, Moss stated that they were going to get a pedicure and that they stopped by a friend's house, but she did not know who the friend was because she stayed in the vehicle. T10; DVD 5:36-5:39.

Allen then returned to where Latimore was standing with Chapeau.  DVD 5:56. He told Latimore that the odor of alcohol he detected was coming from Moss, and that he did not smell any alcohol on Latimore.  DVD 6:00.  Allen asked Latimore if his license was okay, and if he had every been in any trouble before, DVD 6:02, to which Latimore responded that he had "years ago," DVD 6:09, and that it was a DUI. DVD 6:15.

Allen next asked Latimore again about their travels, and whether they had stopped anywhere else.  DVD 6:27.  Latimore stated they also had stopped by a friend's house.  DVD 6:31.[10]  Allen testified that when Allen asked what was the friend's name,

---

[9]     The record is silent as to the reported age on Moss's driver's license, but the transcript reflects that she was over 30 years old. T37.  She does not appear to the Court to be under age. *See* DVD 26:11.

[10]     Contrary to Allen's testimony, Latimore stated he stopped by a friend's house not in response to Allen's questioning about whether he stopped by a friend's house, but in response to Allen asking if they had stopped anywhere else. *Compare* DVD 6:31 *with* T11.

10

"after hesitating for some time . . . almost like he didn't know what the friend's name was," Latimore said "Nick." T11, 26. The DVD reflects that when asked his friend's name, Latimore said "Shit," momentarily hesitated, and then stated "Nick." DVD 6:31-6:35.[11] Allen asked, "It took you that long to think of your friend's name?" DVD 6:36. Latimore's response, other than saying "Nah," is unintelligible. DVD 6:38-6:42.

At DVD 6:55-6:56, Allen tells Latimore that he is going to run his information (asking him as he is walking back to his police car, "You have no warrants?"). Allen returned to his vehicle to prepare a written warning for speeding and failing to maintain lane, and a consent-to-search form since he "suspect[ed] criminal activity was afoot." T11-12, 13; Govt. Exs. 1, 2, 3; DVD at 7:02. While Allen is in his police car, Latimore again is approached by and is observed conversing first with Chapeau, DVD 7:13, and then Kent. *Id.* 10:17. Allen testified it took between 2 and 2½ minutes to perform a license check and prepare the traffic violation warnings. T62-63. The consent-to-search form only took five seconds to fill out because that form auto-

---

[11]      While Allen is questioning Latimore, Chapeau shines his flashlight into the Corvette from the passenger side. *See* DVD 6:27-6:50; T60.

AO 72A
(Rev.8/8
2)

populated from the information inputted into the other documents.   T63-64.[12]

At DVD 10:50, Allen exited his vehicle, and returned Moss's driver's license.[13]

At DVD 10:58, Allen re-engaged Latimore.  Allen returned the license and registration to Latimore, and gave him the traffic warning, explaining that he did not have to appear in court.  DVD 11:05; T17; Govt. Ex. 2.  Although the Court could not clearly hear most of Allen's next comments, Allen explained to Latimore why he was getting a warning for failing to maintain lane, by motioning his hand from side to side while telling Latimore that he "did it three or four times," and explaining that Allen thought he was driving drunk.  DVD 11:14.

Allen then asked Latimore if he had anything in his car like drugs or money, which Latimore denied.  DVD 11:23; T23.  Allen asked him, "Can I search your car?" DVD 11:28.  Latimore appears to respond, "If you need to . . . do you need to search my car?", DVD 11:30, to which Allen responded, "I'd like to."  DVD 11:31.  Allen then stated to Latimore that Latimore and Moss told "completely different stories," particularly since Latimore did not volunteer the part about visiting the friend until

---

[12]     Allen did not call HIDTA from his vehicle.  T64.  The record does not indicate whether the HIDTA agents could overhear Allen's encounter with Latimore.

[13]     Up to this point, Moss was still in the Corvette.

12

Moss told Allen, and Latimore hesitated "ten seconds" in naming his friend Nick. DVD 11:40-11:50; *see also* T33 (Allen testifying that he also told Latimore he wanted to search because of Latimore's nervousness).[14]   Allen again asked him if he had anything illegal inside the car that Allen needed to know about, which Latimore denied. DVD 11:51; T18.   He again asked Latimore if he could search the car, and Latimore verbally stated he could.   DVD 11:56.   Immediately thereafter, however, Latimore again asked why he wanted to search the car, and Allen replied that "I believe . . . (unintelligible) . . . illegal inside the car," to which Latimore responded, "What?"   Allen then stated, " I don't know; that's why I want to search it to find out." DVD 12:03-12:06.   Allen handed Latimore the consent to search form, and stated to him that if he did not mind him searching his car, would he read this and sign right there.   DVD 12:06-12:10; T14.   Before Latimore began to read the consent form, he asked what would Allen do if he did not sign the form, and Allen responded that he would get him (pointing with his head toward a fellow officer off camera) to "run the dog around it."   DVD 12:16; *see also* T34.   In response to that statement, Latimore chuckled loudly.   DVD 12:16-12:17. The video reflects that Latimore began reading

---

[14]   Allen also testified that he wanted to search the vehicle as part of his criminal interdiction duties since he was asked to look for this vehicle.   T33.

AO 72A
(Rev.8/8
2)

the form at 12:19; Allen handed him a pen at DVD 12:25, and walked away from

Latimore (*see also* T34-35); Latimore continued to read the form and began signing it

at DVD 12:55; *see also* T14.[15]   The consent-to-search form provided:

Georgia State Patrol
Consent to Search.

I, FRANKLIN LATIMORE, hereby grant my consent to ALLEN, C. D., CHAPEAU, C., KENT, S., Troopers of the Georgia State Patrol, to search the following described vehicle, including luggage, containers and contents of all.  This includes the removal of any suspicious paneling or other vehicle components in the least intrusive access to any constructed compartment used for the purpose of concealing contraband.

Year: 2013    Make: CHEVROLET    Model: CORVETTE GRAND Color: SIL

Tag Number:  PCX6091 Tag State: GA

I understand that I have the right to refuse to consent of the search described above and to refuse to sign this form.  I further state that no promises, threats, force, physical or mental coercion of any kind whatsoever have been used against me to get me to consent to search the described  above or to sign this form.

My consent is freely and voluntarily given.

Date/Time

---

[15]   While Latimore was signing the consent to search form, Allen is overheard in the background stating to someone "eighty-two thousand, eighty something thousand dollars."  DVD 12:45-12:49.  The record is silent as to whether those comments were heard by Latimore or if that comment pertains to this case.

14

AO 72A
(Rev.8/8
2)

3/4/2013  7:54:05 p.m.

_s/   Frank Latimore_

Gov't Ex. 3; T14-15, 35.

After signing the form, Latimore returned it to Allen.  After putting the form down, Allen asked Latimore if he had any weapons or anything on him, which Allen denied and raised his hands to be frisked.  Allen asked Latimore if he could touch him while he was frisking him.  DVD 13:06-13:09.

Latimore was not handcuffed at any time during the traffic stop.  T32.

Allen then walked over to the Corvette.  Latimore still had the car keys, and Allen asked him to unlock the doors to enable Moss to get out of the Corvette. DVD 13:55-13:57.  Moss got out of the Corvette, and upon questioning, admitted to having a small amount of marijuana in her purse.  DVD 14:10.  Allen proceeded to search the vehicle beginning at DVD 15:18.  At DVD 15:54, Allen asked Latimore to open the trunk, which Latimore did remotely.  DVD 16:00.  A search of that area revealed currency, and Latimore stated, "That's my money."  DVD 16:09.  He was asked how much it was, and it sounds like Latimore responded, "$100,000." DVD 16:20.  After finding the money, Allen asked Latimore where he worked, and

15

Latimore responded that he did not work.  DVD 16:35.  Latimore explained that the money was from the closing of two houses.  DVD 16:37.

The currency was in small denominations and rubber-banded together, and Allen seized it because, based on his training and experience due to the wrappings, it was drug proceeds.  T19.  Latimore was given a receipt of the seized currency.  DVD 36:44.  Latimore was not arrested, and both he and Moss reentered the Corvette and drove away.  DVD 37:42; T39.

### B.      Contentions of the Parties

In its post-evidentiary hearing brief, the Government contends that Latimore voluntarily consented to the search of his vehicle and that the currency was lawfully found.  [Doc. 69 at 20 *et seq.*].  The Government first argues that Allen had at least reasonable suspicion, if not probable cause, to stop Latimore for speeding in that he was paced going 78 miles per hour in a 65-miles-per-hour zone, and also for failure to maintain lane because Defendant "drifted over the dotted white lines with his right wheels," [*id.* at 4-5, 22].  While it acknowledges that the quality of video recording was poor, the Government contends that when viewed at slow motion, the video shows that "Defendant's vehicle either touched the white line or drove over the white

16

line." [*Id.* at 5 n.18, 22].[16]  It then argues that Allen was permitted to continue to detain Latimore to investigate the initial traffic violations, Latimore's nervousness, and, based on the smell of alcohol he detected inside the Corvette, to determine whether Latimore was driving while under the influence of alcohol.  [*Id.* at 20-22, 23-24, 25].  It also argues that it was appropriate to have Latimore get out of the Corvette, and once Allen determined that Latimore had not been drinking, Allen was permitted to investigate whether Moss had been drinking; and then Allen had good reason to return to Latimore to investigate the supposed inconsistencies between Latimore and Moss's answers to his questions.  [*Id.* at 24].

The Government then points out that Allen's interactions with Latimore in investigating whether he had been drinking took only three minutes total (not counting Allen's conversation with Moss), before Allen returned to his vehicle to write the warning citations and prepare the consent to search form.  [*Id.* at 25].  It contends that

---

[16]     The Government contends that while the Corvette's weaving is difficult to see on the video because of the camera angle and video quality, Defendant "put up no testimony to the contrary." [Doc. 69 at 22].  The Court reminds the Government that a defendant has no burden in establishing the existence of reasonable suspicion or probable cause.  It is the Government's burden to demonstrate that the officer had such a basis before initiating the stop. *See Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984); *United States v. Tobin*, 923 F.2d 1506, 1517 n.21, 1520 (11th Cir. 1991) (en banc) (Clark, J., dissenting).

AO 72A
(Rev.8/8
2)

Latimore's argument that these three minutes unreasonably prolonged the traffic stop is baseless.  [*Id.*].[17]  The Government argues that only six minutes elapsed between the traffic stop and Allen's return to his vehicle to prepare the warnings, and that this short time span was reasonable.  [*Id.* at 26].

The Government next argues that *United States v. Hernandez*, 413 F.3d 1206 (11th Cir. 2005), is instructive in resolving the motion in this case, because the *Hernandez* court recognized that conflicting stories and the defendant's unusual nervousness allowed the investigating officer to prolong the traffic stop. [Doc. 69 at 26 & n.149 (citing *Hernandez*, 418 F.3d at 1207-09, for the proposition that court must look at duration of seizure given all the circumstances and not just on the questions asked, and whether they dealt specifically with the purpose of the stop)]. The Government argues that the brief additional detention of approximately four

---

[17]     The Government also argues that Allen had articulable suspicion that Defendant was subject to an ongoing drug investigation.  [*Id.* at 28].  Until making that argument, the Government forswore reliance on the underlying drug investigation as a justification for the traffic stop.  FTR Gold Recording 08/23/2013 @ 3:14:40 PM; *see also* Doc. 53.  The Government cannot now make a contrary assertion.  *Steagald v. United States*, 451 U.S. 204, 209 (1981) (Government may forfeit right to raise factual assertions when it previously made contrary assertions); *cf. United States v. Canty*, 570 F.3d 1251, 1256-57 (11th Cir. 2009) (Government waived right to assert facts on appeal that it stated below it did not rely upon).  Since the Government elected to proceed on the traffic-violations-theory only, the Court will analyze the motion on that basis only.

AO 72A
(Rev.8/8
2)

minutes was warranted because Allen smelled alcohol, Latimore exhibited heightened nervousness, Latimore and Moss gave conflicting stories, and Latimore hesitated in naming the friend at whose house they stopped. [*Id.* at 26]. Further, the Government contends that the stop was properly prolonged due to the four extra minutes that Allen spent checking Latimore's driver's license and registration and preparing the traffic warnings. [*Id.*].

Next, the Government contends that since the stop was not unlawfully prolonged, Latimore's consent was voluntary based on a totality of the circumstances. [*Id.* at 31]. First, it notes that Latimore's consent was in writing and unequivocal; that Latimore did not limit his consent, and that he even popped the trunk for Allen. [*Id.*]. Second, the Government points out that the consent form advised Latimore that he could refuse consent, and that no promises or threats were made to him to induce his consent. [*Id.* at 33]. It also notes that Latimore appeared to read the form, and he was not surrounded by any troopers when he did so. [*Id.* at 33-34]. Third, it notes that Latimore told Allen that there was nothing illegal in the Corvette. [*Id.* at 34]. Fourth, the Government shows that Latimore was 57 years old, had the ability to read and read the consent form without assistance. [*Id.*]. Fifth, it notes that Latimore cooperated with the troopers and was even observed laughing. [*Id.*]. Sixth, the Government contends

19

that even though Latimore initially was nervous, at the time he was asked for consent he spoke freely with Allen and was not restrained.  [*Id.*].  Seventh, it argues that Latimore was not intimidated by law enforcement, noting that he had prior felony convictions.  [*Id.*].  Eighth, the Government contends that Latimore's consent was not preceded by a lengthy and oppressive detention, since he had been detained for approximately ten minutes, the encounter occurred on a public roadway, the troopers never restrained him or pointed weapons at him, and he had received his license and registration back before being asked to consent.  [*Id.*].

Latimore sees the facts differently.  [Doc. 73].  He argues that Allen was prompted to follow and to stop him because of information relayed from the HIDTA agents, and not due to any traffic violations.  He contends that the evidence that he was speeding was insufficient to constitute either reasonable suspicion or probable cause, and that the videotape belies Allen's claim that he crossed the lane marker four or five times.  [*Id.* at 2].  Then, Latimore argues that Allen claimed that he (Latimore) was nervous and there was a smell of alcohol coming from inside the vehicle (but no bottles of alcohol were seen), but after Latimore was told to get out of the Corvette, Allen quickly recognized that the alcohol odor was not coming from Latimore and that he was not under the influence.  [*Id.* at 2-3].  Latimore argues that this could not have been a

20

surprise to Allen, because the HIDTA agents had provided him with no information that would lead him to conclude that Latimore was drinking or otherwise under the influence. [*Id.* at 3]. Latimore argues that instead of processing the traffic violations for which he was pulled over, Allen impermissibly extended the stop in order to "[p]ursu[e] his quest to find a basis to search the car," [*id.*], by asking Latimore about his itinerary and asking Moss where they had been (as well as her age, despite the fact that she was over thirty years old), and thus "developed what the government describes as inconsistencies in the 'stories' told by Latimore and his passenger." [*Id.* at 4]. Latimore argues that the so-called "inconsistencies" did not exist because he acknowledged that they had in fact visited a friend. [*Id.*].

According to Latimore, instead of diligently processing the alleged traffic violations for which Allen stopped the Corvette, it took Allen six minutes to return to his vehicle with Latimore's license and registration to start the traffic citation process. He argues that rather than a routine traffic stop, the goal from the beginning was to search Latimore's vehicle, and the traffic stop was impermissibly delayed in order to develop information to later justify the search. [*Id.* (quoting T52 (where Allen acknowledged that he was trying to get inside the vehicle) and T59, 60 (where Allen conceded he was trying to develop reasonable suspicion)]. Latimore also notes that

21

another trooper shined his flashlight into the vehicle for the same purpose. [Doc. 73 at 5].

Latimore continues that it was only after ten minutes into the stop that he was presented with the consent-to-search form, and that he was told that if he did not consent, a drug detection dog would be deployed around the vehicle. [*Id.* at 5]. Latimore then argues that the Government asks the Court to ignore the HIDTA agents' request for Allen to get into the car, and that to achieve that goal, Allen prolonged the stop to try to develop probable cause or articulable suspicion to further prolong the search or perhaps justify a warrantless search. [*Id.*]. He argues that "[a]ny finding of fact by the court that fails to recognize that this was what the officer did, that this is what motivated the officer, and that this conduct prolonged the stop that would have occurred in the normal routine traffic stop scenario would be unfaithful to the record." [*Id.* at 5-6].

Latimore acknowledges that law enforcement officers conducting traffic stops can ask "fishing expedition"-type questions so long as those questions " 'do not measurably extend the duration fo the stop,' " [*id.* at 6 (quoting *Arizona v. Johnson*, 555 U.S. 323, 333 (2009), and *Mueller v. Mena*, 544 U.S. 93, 100-01 (2005))], but contends that the Government's argument that measures the relatively short time that

22

the stop was prolonged misses the issue to be decided which, he argues, is whether there was an appreciable amount of time spent engaged in the investigation that was not related to the traffic infraction. [Doc. 73 at 7]. He then cites to and summarizes a number of cases involving traffic stops which continued beyond the time necessary to legitimately process the traffic infractions, and where courts have suppressed evidence found as a result of unconstitutional delay. [*Id.* at 8-12].[18]

Latimore next argues that even if Allen's ulterior motives are ignored, there was no reasonable suspicion to prolong the traffic stop. First, he argues that the claim that Latimore was atypically nervous was not specific enough and that nervousness has been rejected by courts as a reason for prolonging a traffic stop. [*Id.* at 12-13]. He also argues that Allen's claim that Latimore crossed the lane markers was belied by the evidence, and since Allen repeated his claim in his testimony that Latimore crossed the lines, this claim casts considerable doubt on Allen's credibility. [*Id.* at 14].

_____

[18]     *United States v. Macias*, 658 F.3d 509 (5th Cir. 2011); *United States v. Digiovanni*, 650 F.3d 498 (4th Cir. 2011); *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008); *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008); *United States v. Jenson*, 462 F.3d 399 (5th Cir. 2006); *United States v. Boyce*, 351 F.3d 1102 (11th Cir. 2003); *United States v. Perkins*, 348 F.3d 965 (11th Cir. 2003); *Joshua v. Dewitt*, 341 F.3d 430 (6th Cir. 2003); *United States v. Childs*, 277 F.3d 947 (7th Cir. 2002) (en banc); *United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990).

23

Further, Latimore argues that the Court should not accept the Government's argument to ignore Allen's subjective motivations, because the Supreme Court more recently has stressed the relevance of an officer's motivation in the Fourth Amendment context. [*Id.* at 14-15 (citing *Florida v. Jardines*, 133 S. Ct. 1409 (2013), and *United States v. Jones*, 132 S. Ct. 945 (2012))]. Latimore argues that in the present case, Allen conceded his ulterior motive—to get into the Corvette—and submits that this motive colored all of his conduct by (1) claiming that Latimore violated the traffic laws and was nervous, (2) his "persistent" questioning to see if Latimore was drunk, and (3) questioning Moss about her age when she clearly was not under age, all of which he asserts had nothing to do with the warning citation for speeding, but instead unlawfully prolonged the stop. [*Id.* at 15]. He argues that Allen's motivation to help the drug investigation controlled his actions and prolonged the stop, since otherwise it would not have taken six minutes to run Latimore's driver's license and registration. [*Id.*]. He submits that the stop was prolonged only so that Allen could develop probable cause, and that the Government's argument that Allen was merely trying to dispel his suspicion of an impaired driver is fiction. [*Id.* at 16]. Latimore argues that, as a result, the consent was involuntary and the fruits of the search should be suppressed. [*Id.* at 17].

24

In reply, in addition to arguing that Defendant's statement of facts is improper argument and not fact, [Doc. 75 at 2], the Government contends that Allen's subjective motivation is irrelevant. [*Id.* at 3]. The Government again argues that it presented, and Allen could rely upon, the information received from HIDTA in conducting his investigation. [*Id.* at 4-6].

The Government next argues that Allen legitimately could investigate whether Latimore was drinking even though he saw no alcohol bottles in the Corvette and the HIDTA agents did not tell Allen that they saw Latimore drinking, since Allen observed Latimore speeding and crossing over the line markers and he also detected an alcohol smell in the vehicle. It claims that those facts gave rise to a duty on Allen's part to investigate violations of the law. [*Id.* at 6-7 & n.7 (citing *United States v. Simmons*, 172 F.3d 775, 779 (11th Cir. 1999)]. The Government also argues that this investigation took only four minutes, and not the six minutes claimed by Defendant. [*Id.* at 7-8].

The Government further argues that Allen had objective reasons supporting all of his actions. It argues that, first, Allen spent less than four minutes investigating whether Defendant or Moss was drinking. Second, it contends that Allen spent less than one minute trying to clarify inconsistencies between Latimore and Moss's statements. [*Id.* at 9]. It also argues that Allen was not trying to "find" or "develop"

25

suspicion because as soon as he walked over to the Corvette, he smelled alcohol, which fact has not been disputed by Latimore.  [*Id.*].  The Government argues that once he smelled alcohol, Allen was required to investigate the smell.  [*Id.*].

Further, the Government contends that Latimore's reliance on *Jardines* in order to make an officer's subjective intent relevant is misplaced, because in that case the subjective reason for being on Jardines' front porch was relevant, whereas here, Allen testified that he would not have pulled over the Corvette if he did not have probable cause.  [*Id.* at 10].  The Government additionally notes that *Jardines* cited *Ashcroft v. al-Kidd*, 131 S. Ct. 2074 (2011), and *Whren v. United States*, 517 U.S. 806 (1996), both of which direct courts to apply an objective standard in ruling on Fourth Amendment claims.  [Doc. 75 at 10-11 & n.11 (citing *Jardines*, 133 S. Ct. at 1416)].  The Government also sought to distinguish the cases relied upon by Latimore in his argument that the stop in this case was unlawfully prolonged.  [*Id.* at 11-15].

The Government next argues that the Court should reject Latimore's argument that Allen was not credible.  First, it asks the Court to reject Latimore's argument that Allen "fibbed" about crossing the lane marker because the dash-cam video was difficult to see but it shows that Defendant's vehicle was near or on the white lines and Allen had the best opportunity to see the traffic violation in real time.  [*Id.* at 15].  Second, it

26

then argues that although Latimore claims he was "cold stone sober," there was no way that Allen could have determined that after he smelled alcohol coming from inside the Corvette, and he had to conduct an investigation in order to determine whether or not Latimore was drinking.  [*Id.* at 16].  It claims the investigation was reasonable since Allen had to not only smell Latimore's breath but observe his demeanor, and this part of the investigation took less than four minutes.  [*Id.*].  The Government argues that Allen then went to investigate whether Moss was old enough to drink and did not determine that she was over the drinking age until he saw her driver's license.  [*Id.* at 16-17].  It claims that Allen was credible because his testimony was confirmed by the video.  [*Id.* at 17].

## C.    Discussion

The Fourth Amendment protects people against unreasonable government searches and seizures that intrude on their reasonable expectations of privacy. U.S. Const. amend. IV; *Florida v. Jimeno*, 500 U.S. 248, 250 (1991); *United States v. Place*, 462 U.S. 696, 706-07 (1983).  Accordingly, a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location. *Skinner v. Ry. Labor Execs' Ass'n*, 489 U.S. 602, 619 (1989); *Mincey v. Arizona*,

27

437 U.S. 385, 390 (1978). " '[S]earches conducted outside the judicial process . . . are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions.' " *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted)); *see also United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) ("The courts have . . . fashioned exceptions to the general rule [that warrantless searches are presumptively unreasonable], recognizing that in certain limited situations the government's interest in conducting a search without a warrant may outweigh the individual's privacy interest."); *United States v. Campbell*, 920 F.2d 793, 795 (11th Cir. 1991) ("A search without a warrant based on probable cause is illegal, unless the government can show that it falls into one of those limited exceptions recognized by law."). The propriety of a warrantless search is judged by its reasonableness. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).

"Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. The Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the [F]ourth [A]mendment." *United States v. Freire*,

AO 72A
(Rev.8/8
2)

710 F.2d 1515, 1519 (11th Cir. 1983) (citation omitted). The burden to establish the application of the warrant exception is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.") (citing *Lego v. Twomey*, 404 U.S. 477, 488-89 (1972)). A preponderance of the evidence simply means an amount of evidence that is enough to persuade the Court that the existence of a fact is more probable than its non-existence. *Metropolitan Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997); *see also United States v. 4 Meadowbrook Lake Condominium, Unit 308, Condominium # 8, Located at 314 SE 10th Street, Dania, Florida 33004*, No. 06-60079-CIV-COHN/SNOW, 2007 WL 809681, at *3 (S.D. Fla. Mar. 15, 2007) ("A preponderance of the evidence means that the United States 'must present an amount of evidence sufficient to persuade the court that the claim or contention is more likely true than not true.' ") (citing Eleventh Circuit Pattern Jury Instructions, Civil (2000), Basic Instruction 6 .1, Burden of Proof).

The Government alleges that the warrantless seizure and search on March 4, 2013, were legitimate based upon two exceptions to the Warrant requirement:

29

(1) the traffic stop based on either probable cause or reasonable suspicion; and (2) the consent to search.

    1.    *The traffic stop*

        a.    *Reasonable suspicion/probable cause to stop the Corvette*

A brief, investigatory stop—a so-called "*Terry* stop"—is a recognized exception to the Fourth Amendment's Warrant requirement. *See Terry v. Ohio*, 392 U.S. 1 (1968); *Gordon*, 231 F.3d at 754. Because a routine traffic stop is only a limited form of seizure, it is more analogous to an investigative detention than a custodial arrest. *See Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). Therefore, the legality of these stops is analyzed under the *Terry* standard. *United States v. Lewis*, 674 F.3d 1298, 1312 n.3 (11th Cir. 2012); *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001); *see also United States v. Spoerke*, 568 F.3d 1236, 1248 (11th Cir. 2009) ("A traffic stop, which is a seizure within the meaning of the Fourth Amendment, is constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*.") (citations and quotation marks omitted). *Terry*, and the cases which have followed it, make clear that "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the

AO 72A
(Rev.8/8
2)

officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000).  Reasonable suspicion is defined as "specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *United States v. Cooper*, 873 F.2d 269, 274 (11th Cir. 1989) (quoting *Terry*, 392 U.S. at 21, and *United States v. Espinosa-Guerra*, 805 F.2d 1502, 1508 (11th Cir. 1986)); *see also United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (holding that if there is not probable cause to believe a traffic violation has occurred, police officers may conduct a brief investigatory stop of a vehicle "if they have a reasonable, articulable suspicion based on objective facts that an individual is engaged in criminal activity") (quotation marks omitted). " '[A] reasonable suspicion of criminal activity may be formed by observing exclusively legal activity,' " *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007) (quoting *Gordon*, 231 F.3d at 754), "even if such activity is 'seemingly innocuous to the ordinary citizen.' " *Id.* (quoting *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000)).

Courts employ a two-part inquiry in determining whether an investigative traffic stop was reasonable: (1) whether the officers had reasonable suspicion to conduct the stop and thereby seize the individual; and (2) whether the stop was reasonably related

AO 72A
(Rev.8/8
2)

in scope to the circumstances which justified the stop initially. *United States v. Acosta*, 363 F.3d 1141, 1144-45 (11th Cir. 2004) (citing *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).

First, in determining whether reasonable suspicion existed, a judge must review the totality of the circumstances to ascertain whether officers had a particularized and objective basis to suspect unlawful conduct. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *United States v. Torres-Bonilla*, --- Fed. Appx. ----, ----, 2014 WL 718426, at *3 (11th Cir. Feb. 26, 2014). The question is whether "the facts available to the officer at the moment of the seizure or search 'warrant a [person] of reasonable caution in the belief that the action taken was appropriate.' " *Harris*, 526 F.3d at 1337 (quoting *Terry*, 392 U.S. at 22, and *United States v. Blackman*, 66 F.3d 1572, 1576 (11th Cir. 1995)). In evaluating whether or not an officer's suspicion is reasonable, "due weight must be given . . . to the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of [the officer's] experience." *Terry*, 392 U.S. at 27; *see also Arvizu*, 534 U.S. at 273 (directing reviewing courts to employ totality-of-circumstances test to determine "whether the detaining officer has a 'particularized and objective basis for suspected legal wrongdoing' " since this "process allows officers to draw on their own experience and specialized training to make

32

inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person' ") (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). "Although an officer's reliance on a mere hunch is insufficient to justify a stop, . . . the likelihood of criminal activity need not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (internal citations and quotation marks omitted)).

Further, courts employ an objective test in determining the existence of reasonable suspicion, and an officer's subjective intentions or beliefs are immaterial. *United States v. Robinson*, 515 Fed. Appx. 790, 792 (11th Cir. Mar. 19, 2013) (citations omitted); *see Evans v. Stephens*, 407 F.3d 1272, 1280 n.9 (11th Cir. 2005) (noting that an officer's "subjective intentions and beliefs . . . are immaterial to the Fourth Amendment analysis.") (citing *Graham v. Connor*, 490 U.S. 386, 397)); *see also United States v. Holloman*, 113 F.3d 192, 194 (11th Cir. 1997) (recognizing that *Whren v. United States*, 517 U.S. 806, 812-13 (1996), "squarely rejected the pretextual stop analysis"; the reasonableness of a traffic stop is determined irrespective of the officer's intent, and holding that because the officers making the traffic stop had probable cause

33

to believe that a traffic violation had occurred, they did not violate the Fourth Amendment, "notwithstanding their subjective desire to intercept any narcotics being transported"); *Evans*, *id.* ("Ulterior motives will not make an otherwise lawful search unlawful.").

As a result, the Court rejects Latimore's argument that the Court must look at Allen's subjective intent, since to do so would violate binding directions from the Supreme Court and the court of appeals.  Similarly, the Court rejects Latimore's argument that the Supreme Court's decisions in *Jardines* and *Jones* either resurrected the relevance of subjective intent in Forth Amendment jurisprudence or allow the Court to consider an officer's subjective intent or ulterior motives in conducting a reasonable suspicion/probable cause analysis.  First, *Jardines* explained that courts still must determine if the officer's action was objectively reasonable.  In discussing *El-Kidd* and *Whren*, the *Jardines* court stated that "those cases merely hold that a stop or search that is objectively reasonable is not vitiated by the fact that the officer's real reason for making the stop or search has nothing to do with the validating reason." *Jardines*, 133 S. Ct. at 1416.  In *Jardines*, the issue was whether the police could deploy a drug dog at the defendant's front porch, and the prosecution had argued that the police could do so because approaching the front door of a residence was an implicit license

34

typically permitting a visitor to approach a home.  The *Jardines* court framed the issue in that case as "*whether* the officer's conduct was an objectively reasonable search," and that inquiry "depend[ed] upon whether the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered."  *Id.* at 1416-17 (emphasis in original).  Although facially an argument could be made that *Jardines* considered the subjective intent of the officers, the case does not stand for that proposition and does not abrogate the objective rule.  Instead, the decision turned on whether or not, given what the officers *intended* to do—deploy a drug dog—the conduct was consistent with the implied license given to the public to approach the front door of a private residence, which is considered objectively.  The Supreme Court held that it was not.  Similarly, in this case, despite Allen's ulterior motives to stop and search the Corvette for evidence of Latimore's involvement with drugs, the Court must evaluate whether Allen's actions—stopping the Corvette for speeding and failing to maintain lane, and his subsequent investigation—were objectively reasonable regardless of his subjective intent or ulterior motives.

Likewise, *Jones* does not require or suggest that the Court jettison the objective test.  In *Jones*, the question was whether the warrantless placing and monitoring of a beeper on a vehicle in order to track the vehicle's movements violated the Fourth

35

Amendment.  *Jones*, 132 S. Ct. at 947.  Although the officers' intent of the warrantless

intrusion—to obtain information about the vehicle's movements—was discussed in

*Jones*, the Court found the warrantless action objectively offensive to the

Constitution.  *Id.* at 949.  There was no ulterior motive to disavow in *Jones*, since the

officers were quite up front about what they wanted to accomplish and why.  *Jones* did

not discuss the officers' subjective intent or their ulterior motives as being in play.  As

a result, *Jones* does not mandate that this Court apply a subjective standard in this case.

As noted, in proceedings prior to the evidentiary hearing, the Government stated

that it was relying only upon the traffic violations observed by Allen to justify the stop

of the Corvette.  Latimore argues that the Court cannot ignore the fact that Allen was

part of a task force investigating Latimore for involvement in narcotics trafficking, but

as noted above, the Court is not allowed to consider what Allen's subjective intent was

in analyzing whether, objectively, there was reasonable suspicion or probable cause to

direct the Corvette to stop and to conduct a roadside investigation that led to Latimore

consenting to the search of the Corvette.  To the extent that the Government is now

trying to argue that Allen could consider information that Latimore was a subject of a

drug investigation, the Court disregards those arguments because it is inconsistent with

the Government's prior arguments.  On the other hand, where Allen's subjective intent reflects on his credibility, the Court may consider such intent.

Turning to the objective reasons for the stop, first, the Court finds that Allen had reasonable suspicion, if not probable cause, to stop the Corvette for speeding in violation of O.C.G.A. § 40-6-181.[19]  Although the Government did not introduce Allen's radar or GPS results, the undisputed evidence based on Allen's testimony is that Latimore was going 78 miles per hour in a 65-miles-per-hour zone.[20]  In addition, the Court has reviewed the video of Allen's pacing of the Corvette, and on at least two occasions during this short video clip, and prior to Allen turning on his blue lights,

---

[19]     O.C. G.A. § 40-6-181(b) provides in pertinent part that

no person shall drive a vehicle at a speed in excess of the following maximum limits:

* * *

(3) Sixty-five miles per hour on a highway on the federal interstate system which is inside of an urbanized area of 50,000 population or more, provided that such speed limit is designated by appropriate signs[.]

O.C.G.A. § 40-6-181(b)(3).

[20]     The fact that Latimore may have protested to Allen that he was traveling at least as fast as other vehicles does not contradict Allen's testimony that Latimore was speeding.

37

Latimore's vehicle is seen rapidly passing two other vehicles that were traveling in the center and right hand lanes of I-675. *See* DVD 0:37, 0:45. In conjunction with Allen's testimony, the video is sufficient evidence to establish, at a minimum, a reasonable suspicion supporting Allen's stop of the Corvette for speeding. *United States v. Freeman*, 438 Fed. Appx. 864, 866 (11th Cir. Aug. 25, 2011) (holding that probable cause that defendant was speeding authorized traffic stop); *see also United States v. Pruitt*, 174 F.3d 1215, 1217 n.1 (11th Cir. 1999) (noting that probable cause existed to conduct a traffic stop because the defendant was speeding); *United States v. Griffin*, No. 2:10-CR-16-RWS-SSC, 2010 WL 6815894, at *5 (N.D. Ga. Sept. 8, 2010) (concluding that an officer's testimony that the defendant's car "was driving in excess of the speed limit[ ]" was credible "based on [the officer's] observation that the [vehicle] was passing by other vehicles, his experience in training in visual estimations of speed, and his observation of the [vehicle's] speed while he 'paced' it") (R&R), *adopted by* 2011 WL 2518808 (N.D. Ga. June 24, 2011); *United States v. Fuentes*, Criminal Action No. C-09-860, 2010 WL 707424, at *3 (S.D. Tex. Feb. 23, 2010) (finding officers' testimony that defendant was speeding credible despite lack of corroborating radar where dashboard camera recorded defendant's truck audibly louder and it appeared to be traveling faster than other passing cars).

38

Second, Allen's claim that Latimore failed to maintain his lane of travel presents a much closer call. Georgia law provides:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]

O.C.G.A. § 40-6-48(1). The Court has reviewed the DVD several times, and at different speed settings. It does not support Allen's description that the Corvette "drifted over" (T6), was "driving over" (T21), or "crossed" (T45-47) the white dashed lines "four or five times." At most, the Corvette's right side tires barely touched the left edge of the white dashed line separating the far left hand lane from the center lane on three occasions, at DVD 0:16, 0:20, and 0:28.

In *United States v. Bryson*, Criminal Case No. 1:13-CR-09-ODE-GGB, 2013 WL 5739055 (N.D. Ga. Oct. 21, 2013), after discussing relevant Georgia case authority, District Judge Evans concluded that touching the line "is a factor that may, *in combination with other conduct*, give rise to probable cause justifying a traffic stop" but that "*in the absence of such additional conduct*, the mere touching of the white dashed line between two or more clearly marked lanes is insufficient" by itself to provide a basis for law enforcement to stop the vehicle. *Id.* at *4 (emphasis supplied).

39

In *Bryson*, the defendant's conduct "involved nothing more than touching the lane line on two occasions," and thus did not amount to probable cause to believe that Bryson violated § 40-6-48(1). *Bryson*, *id.* However, Judge Evans concluded that the trooper in that case had reasonable suspicion to stop Bryson to investigate whether he had been drinking because the trooper also testified that based on the observed conduct, the time of night and location (3:07 a.m. in the Buckhead section of Atlanta where the saloons stay open until 5:00 a.m.), and the trooper's knowledge that those driving under the influence commonly fail to maintain their lanes, amounted to lawful reasonable suspicion. *Id.* at *6; *see also United States v. Hernandez*, --- F. Supp. 2d ----, ----, 2014 WL 587864, at *3 (N.D. Ga. Feb. 14, 2014) (Totenberg, J.) (concluding that officer had neither probable cause nor reasonable suspicion to stop vehicle under § 40-6-48(1) where vehicle only touched the lane divider lines and there was "no other 'additional' conduct or conditions that would suggest the driver's intoxication or other conduct whatsoever indicating a safety risk or traffic violation).

In the present case, as noted, while the video was activated, at most Latimore touched the white dashed line on the right hand side of his lane of traffic three times.[21]

---

[21] Allen testified that he activated the camera as soon as he saw Latimore "cross" the line. Allen's description of what he observed prior to activating the camera, then, is treated as identical to what was displayed on the video after the camera was

40

Under *Bryson* and *Hernandez*, that was insufficient to constitute probable cause to believe that Latimore violated § 40-6-48(1).

Nor did Latimore's touching the line three times give rise to reasonable suspicion.  Unlike *Bryson*, there was no testimony or evidence of other conduct or conditions that objectively gave rise to a reasonable suspicion that Latimore was driving under the influence.[22]  Allen had no information prior to the traffic stop that Latimore was drinking, nor did he testify as to any conditions that would allow him to reasonably conclude that Latimore's touching the white dashed lines indicated that he was impaired, such as the time of day or other erratic behavior.  He did not testify, for example, that in his experience a person under the influence commonly exceeds the speed limit, so as to satisfy the additional condition that *Bryson* holds is needed where the defendant has merely touched the white divider lines but remained in her lane of

_____

activated.

[22]   The Court recognizes that *Semich v. State*, 234 Ga. App. 89, 92, 506 S.E.2d 216, 219 (1998), can be read to hold that "the police can stop drivers who engage in erratic driving behavior, even if it is simply weaving within a lane." Judge Evans in *Bryson* concluded that the *Semich* decision held that since weaving in one's own lane was not per se a violation of § 40-6-48(1), additional conduct or conditions—such as the late hour and turning around to avoid police contact—were necessary to establish reasonable suspicion.  *Bryson*, 2013 WL 5739055 at *5.

41

traffic, in order to have reasonable suspicion to believe that § 40-6-48(1) has been violated.

Thus, the Court concludes that the only legitimate basis for the traffic stop was to investigate Latimore's speeding.

> b. *Allen's investigation of the traffic stop and whether reasonable suspicion existed to prolong the traffic stop*

As for the second *Terry* prong, the officer must pursue the investigation in a diligent and reasonable manner, *see e.g., United States v. Sharpe*, 470 U.S. 675, 687 (1985), such that a traffic stop must last "no longer than is necessary to effectuate the purpose of the stop," and "the scope of the detention must be carefully tailored to its underlying justification." *Pruitt*, 174 F.3d at 1220 (quotations and alteration omitted); *see also United States v. Gonzalez*, 275 Fed. Appx. 930, 932 (11th Cir. May 2, 2008) (holding that " 'an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place' ") (quoting *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001), and *Terry*, 392 U.S. at 20).  On the other hand, police are not constitutionally required to move at top speed or as fast as possible.  *Hernandez*, 418 F.3d at 1212 n.7 (citation omitted). "Ordinarily, when a citation or warning has been issued and all record checks have

42

been completed and come back clean, the legitimate investigative purpose of the traffic stop is fulfilled." *United States v. Simms*, 385 F.3d 1347, 1353 (11th Cir. 2004).

An officer's prolonging of a traffic stop beyond its initial purpose is only reasonable in the limited circumstances where there is "an objectively reasonable and articulable suspicion [that] illegal activity has occurred or is occurring," or if the driver consents. *Pruitt*, 174 F.3d at 1220. In such a case, the officer is justified in continuing the initial detention at least temporarily until her suspicions are either confirmed or dispelled. *United States v. Garcia-Aleman*, No. 1:10-CR-29, 2010 WL 2635071, at *1 (E.D. Tex. June 9, 2010) (R&R), *adopted by* 2010 WL 2635073, at *1 (E.D. Tex. June 30, 2010) ("[I]f additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, the detention may continue until the new reasonable suspicion has been dispelled or confirmed.") (citations omitted).

At the same time, the Supreme Court and the Eleventh Circuit have held that "[a]n officer's inquiries into matters unrelated to the justification for the traffic stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop. *Arizona v. Johnson*, 355 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005)); *United States v. Griffin*, 696 F.3d 1354, 1362 (11th Cir. 2012) (holding that

43

"unrelated questions posed during a valid *Terry* stop do not create a Fourth Amendment problem unless they 'measurably extend the duration of the stop' "); *United States v. Burrows*, --- Fed. Appx. ----, ----, 2014 WL 1704369, at *4 (11th Cir. May 1, 2014) (same).

During the course of a lawful traffic stop, the officer may use a flash light to illuminate a vehicle's dark interior. *Purcell*, 236 F.3d at 1277-78 (citing *United States v. Dunn*, 480 U.S. 294, 305 (1987)). Similarly, an officer who makes a valid traffic stop is entitled to require the driver to exit his vehicle. *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977). Moreover, although the Court's research has not uncovered any case where the Eleventh Circuit has directly addressed the issue, at least the en banc Fifth and Eighth Circuit Courts of Appeals have recognized that an officer conducting a valid *Terry* traffic stop may ask routine questions such as the destination, route, and purpose of the trip. *United States v. Brigham*, 382 F.3d 500, 510 (5th Cir. 2004) (en banc); *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc). The officer may also ask the passenger similar questions to verify the information the driver provided. *United States v. Linkous*, 285 F.3d 716, 719 (8th Cir. 2002); *see also United States v. Artiles-Martin*, No. 5:08-cr-14, 2008 WL 2600787, at *8 (M.D. Fla. June 30, 2008) (holding that "as part of an

44

officer's reasonable investigation during a traffic stop an officer may ask questions regarding the driver's destination and purpose") (citing *United States v. Johnson*, 58 F.3d 356, 357 (8th Cir. 1995)).

Further, "[a]n officer conducting a routine traffic stop may request consent to search the vehicle." *Purcell*, 236 F.3d at 1281 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)); *see also Simmons*, 172 F.3d 775, 778 (11th Cir. 1999) ("Once the police had validly detained [the driver], plainly they were entitled under the decisional law to conduct a variety of checks on the driver and his car," including "requesting consent to search the car"). And, once a driver has agreed to the search, "the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given." *Purcell*, 236 F.3d at 1279 n.8.

Where "an investigative [detention] continues indefinitely, at some point it can no longer be justified as an investigative [detention]." *Sharpe*, 470 U.S. at 685. However, there is no "rigid time limitation" applicable to determining whether an investigative detention is unreasonable, because "[s]uch a limit would undermine the equally important need to allow authorities to graduate their responses to the demands of any situation." *Id.* As the Supreme Court noted in *Sharpe*:

45

> In assessing whether a detention is too long in duration to be justified as an investigative stop, . . . it [is] appropriate [for the court] to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.   . . .   A court making this assessment should take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing. . . . A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.  But '[t]he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, itself, render the [detention] unreasonable. . . . The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.'"

*Sharpe*, 470 U.S. at 686-87 (internal citations omitted).

Applying these guidelines to the facts of this case, although Latimore's touchings of the lane divider lines did not authorize the initial stop in this case, the Court concludes that, upon approaching the passenger side of the vehicle and detecting a slight smell of alcohol, Allen objectively could consider Latimore's touching the white dashed lines on the highway in light of the smell of alcohol, and conduct an investigation into whether Latimore was driving impaired.[23]  *Miller v. Harget*,

_____

[23]    The Court rejects Latimore's argument that Allen had no reason to suspect that Latimore had been drinking because he was not advised by the HIDTA agents that he was observed drinking, nor did Allen see any alcoholic beverage containers in the vehicle.  Neither of these arguments discredit the evidence that Allen smelled alcohol coming from the vehicle, and it appears that Moss later confirmed that she had had

46

458 F.3d 1251, 1259-60 (11th Cir. 2006) (officer had reasonable suspicion of DUI where upon approaching vehicle he "smelled alcohol" and "one occupant of the car . . . had been drinking."); *see also United States v. Ivey*, 307 Fed. Appx. 941, 942 (6th Cir. Jan. 26, 2009) (holding that smell of alcohol provided requisite suspicion to justify continued detention under *Terry*); *cf. United States v. Packer*, 375 Fed. Appx. 976, 978 (11th Cir. Apr. 23, 2011) (holding that officer, who properly stopped defendant for traffic infraction, could extend stop to investigate open container violation based on observations following stop). Thus, Allen could extend the traffic stop to investigate whether Latimore was drinking. *Miller*, 458 F.3d at 1259 ("[W]hen Officer Harget smelled alcohol coming from the vehicle Mr. Miller had been driving, he had reasonable suspicion to detain Mr. Miller in order to investigate.").

On the other hand, the Court concludes that Allen's testimony about Latimore's initial nervousness may not contribute to reasonable suspicion allowing the stop to be prolonged. First, the Court agrees with Latimore that Allen's testimony about the nervousness and shaking was exceptionally general, vague and nondescript. Comparing Latimore's level of nervousness to some hypothetical "soccer mom" does not provide the Court with enough specificity to allow it to determine whether Allen's

_____

something alcoholic to drink.

47

suspicions were objectively reasonable.  Second, the video does not reflect Latimore's nervousness, because once he was visible in front of the camera, Latimore did not exhibit signs of extreme nervousness, nor does the video show him visibly shaking or otherwise reflect him engaging in any agitated behavior.  The Court surmises that Latimore must not have been very nervous in the Corvette because once he was placed in front of the dashboard video and within a very few minutes of supposedly being unusually nervous, he appeared composed, relaxed and not nervous, when it is reasonable to conclude that one's nervousness would increase consistent with the increasing level of law enforcement scrutiny.  Third, the Eleventh Circuit has held that nervousness "cannot support a legitimate inference of further illegal activity that rises to the level of objective, reasonable suspicion required under the Fourth Amendment." *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003).

It was, however, objectively reasonable for Allen to ask Latimore about his destination and itinerary, both for purposes of investigating his demeanor as part of the driving-while-drinking investigation and as an allowable inquiry during a lawful traffic stop, *Linkous*, 285 F.3d at 719; *Artiles-Martin*, 2008 WL 2600787 at *8; and to seek to verify his answers by then questioning Moss about their itinerary.  *Linkous*, *id.*; *see also United States v. Pack*, 612 F.3d 341, 351-52 (5th Cir. 2010) ("An officer may

48

ask about the purpose and itinerary of a driver's trip during a traffic stop . . . [and] undertake similar questioning of the vehicle's occupants to verify the information provided by the driver.") (citations and punctuation omitted).

Moreover, the Court concludes that Allen pursued his suspicions with diligence by asking Latimore and Moss about their itinerary.  There is no "per se rule requiring an officer immediately to obtain the driver's license and registration information and initiate the relevant background checks before asking questions."  *Brigham*, 382 F.3d at 511; *see also United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988) (recognizing that "the most important factor [for courts to consider] is whether the police detained [the defendant] to pursue a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference").  Although Defendant argues that all of Allen's inquiries were a ruse in an attempt to get inside Latimore's vehicle, particularly since Allen did not check Latimore's license and registration until over six minutes into the stop, the objective facts that the Court must analyze demonstrate that there was an objective basis for Allen to investigate whether Latimore was drinking, which Allen diligently pursued by having Latimore exit the Corvette in order to isolate the alcohol smell, and by asking him questions to see his demeanor.  At the same time, as part of a routine traffic stop inquiry, Allen could ask

49

Latimore about his itinerary (and to attempt to verify Latimore's statements by briefly questioning Moss). Since these inquiries were pursued diligently and are considered routine, like a check of a driver's license and a vehicle registration, *Purcell*, 236 F.3d at 1278, the stop was not unlawfully extended.

Further, Allen properly could extend the traffic stop due to inconsistencies between Latimore and Moss's descriptions of their itinerary as it relates to stopping at a friend's house. *See United States v. Ubaldo-Viezca*, 398 Fed. Appx. 573, 575, 581 (11th Cir. Oct. 6, 2010) (occupants of vehicle providing conflicting statements about destination, one stating that they were on their way to an auction in North Carolina while other stated auction was in South Carolina, was considered one factor in establishing a reasonable suspicion to continue traffic stop); *Pruitt*, 174 F.3d at 1220 (among the variety of factors that have justified further questioning during a traffic stop is "inconsistent statements about destination"); *United States v. Sanchez*, 408 F. Supp. 2d 1255, 1259 (S.D. Fla. 2005) (finding that the inconsistent statements about travel made by the driver and passenger were "sufficient to arouse reasonable suspicion"). *Cf. United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003) (recognizing that "conflicting answers about where one is traveling to or from may give rise to a suspicion of drug activity because most drivers know the answers to these

50

questions and because the driver may be trying to hide the fact that he is going to or coming from a known drug-source state") (citations omitted).  The Court recognizes that in *Perkins*, 348 F.3d at 971, the Eleventh Circuit noted that inconsistent answers did not amount to reasonable suspicion to extend a stop.  However, what *Perkins* actually stated is that the answers in that case were not in fact inconsistent, just different, because the vehicle occupants in *Perkins* could intend on visiting different persons once they reached their destination.  *Id.*  In this case, Allen reasonably could conclude that Latimore's failure to include the stop at the friend's house when explaining their itinerary was inconsistent with Moss's answer to virtually the same question.

Moreover, to the extent that questions about destination and itinerary to both Latimore and Moss extended the traffic stop, these inquiries did not measurably extend the duration of the stop.  Allen was able to determine, based on Latimore's demeanor and the lack of odor of alcohol coming from him, that Latimore was not under the influence of alcohol, as of DVD 4:37.  Allen then approached and spoke with Moss for approximately one minute, DVD 4:41-5:39, before returning to Latimore and further questioning him for approximately one minute about their itinerary.  DVD 5:56-7:02.  At that point, Allen re-entered his patrol car to begin writing the traffic warnings and

51

prepare the consent-to-search form.  As *Griffin* directs, the Court must "not simply look at the 'interval of prolongation in isolation,' but rather assess the length of the stop as a whole, including any extension of the encounter, by undertaking a fact-bound, context-dependent analysis of all of the circumstances concerning the stop and the unrelated questions."  *Griffin*, 696 F.3d at 1392.  A consideration of all of the facts in this case leads the Court to conclude that the detention was not unlawfully prolonged.[24] And, even if there was some delay not attributable to reasonable suspicion (the Court finds there is none), any delay was *de minimis* and thus not a violation of the Fourth Amendment.  *Hernandez*, 418 F.3d at 1212 n.7 (stating that "[o]f trifles the law does not concern itself: *De minimis non curat lex* "); *Purcell*, 236 F.3d at 1279 (concluding

_____

[24]   This conclusion should not be taken as an invitation to the Government to regularly repeat what it did in this case.  The Government adamantly tried to separate the present federal firearms case from Latimore's state drug case(s).  It argued to this Court that Latimore was not entitled to (and convinced the  Court not to allow) discovery in this case of the underlying drug investigation, including discovery relating to surveillance of the house that the Government claims Latimore visited before the traffic stop discussed in the text.  The Government also objected to the hearing that the Court held on this traffic stop on the grounds that the stop was irrelevant to the evidence it would introduce at trial about Latimore's weapons possession.  Then, the Government tried to bleed facts of the underlying drug case back into this case as support for Allen's reasonable suspicion for delaying the stop.  [Doc. 69 at 22 n.141; *id.* at 28 ("Defendant was a subject of an ongoing drug investigation"); Doc. 75 at 5]. The Court has not allowed the Government to do that in this case, and will closely scrutinize the Government's further attempts to compartmentalize separate but clearly related investigations.

AO 72A
(Rev.8/8
2)

that a *de minimis* delay during a traffic stop did not violate the Fourth Amendment); *see also United States v. Peguero*, 518 Fed. Appx. 792, 795 (11th Cir. May 9, 2013) ("[T]he [Supreme] Court [has] held, in a case involving a traffic stop, that '[a]n officer's inquiries into matters unrelated to the justification for the . . . stop . . . do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.' ") (quoting *Griffin*, 696 F.3d at 1361, and *Johnson*, 555 U.S. at 333).

The cases relied upon by Latimore do not undermine this conclusion because in each of those cases, unlike here, law enforcement did not have reasonable suspicion to expand either the scope or the duration of the traffic stop.  In *Macias*, nearly eleven minutes elapsed before the trooper performed the computer checks.  658 F.3d at 518-19.  In the interim, he asked a number of questions unrelated to the stop for a seat belt violation or the purpose or itinerary of the trip (which was medical related), such as asking the driver about his employment, the type of work he did, whether he owned his own business, and whether he had been in trouble before; and asking his passenger (the girlfriend's daughter) about the driver's relationship with her mother, whether the driver had been in trouble before, how many children the passenger had and who was watching them while she was away, why her mother was not on this trip, and her

53

employer and those of her mother and the driver. *Id.* at 519. The *Macias* court held that these unrelated questions unlawfully extended the detention, and rejected the Government's argument that the driver's answers created reasonable suspicion, stating that reasonable suspicion must be possessed "*before* extending a stop by asking unrelated questions." *Id.* at 522. The present case is dissimilar, not only because the extension of the stop was much shorter than in *Macias*, but also because the questions asked by Allen either were part of a routine traffic stop or based on reasonable suspicion.

In *Digiovanni*, the defendant was stopped for following too close in violation of state traffic law. 650 F.3d at 501. The police officer was suspicious of the shirts hanging up and the hygiene bag in the back seat, as well as the one way rental contract from Ft. Lauderdale to Boston, and proceeded to "embark[] on a sustained course of investigation into the presence of drugs in the car that constituted the bulk of the encounter between" the trooper and the defendant. *Id.* at 509. The court held that the delay in the case was not *de minimis*, but rather due to the officer's "utter lack of diligence" in investigating the violation for which the defendant was stopped. *Id.* at 510. Moreover, while the *Digiovanni* court found the questions posed about travel history and travel plans were mainly unrelated to the reason for the stop,

54

it also found that the officer "embarked on a sustained investigation into the presence of drugs, instead of either completing the warning ticket or beginning the driver's license check," and when the officer finally returned to his car, instead of beginning the driver's license check, he radioed for back-up assistance. Only then did he relay Digiovanni's driver's license information to the dispatcher and complete the warning ticket. Approximately fifteen minutes into the stop, the officer returned to the defendant his driver's license and the rental contract, and issued him a warning ticket, but "in the same breath," returned to the subject of drugs. *Id.* The court concluded that the officer exceeded the scope of a permissible *Terry* stop in scope and duration and thus reasonable suspicion was not present to turn a routine traffic stop into a drug investigation. *Id.* at 513.

In the present case, the duration of the stop was shorter and to the extent the initial justification for the stop was exceeded, reasonable suspicion warranting additional investigation existed. Once Allen smelled alcohol, he was entitled to investigate its source, and in doing so, ask Latimore questions. *Berkemer*, 468 U.S. at 439 ("Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information

55

confirming or dispelling the officer's suspicions."). Once the brief questioning elicited inconsistent answers, he was authorized to investigate those as well.

In *United States v. Peralez*, 526 F.3d 1115 (8th Cir. 2008), where the court of appeals reversed the district court's suppression of evidence, the officer pulled over a van for a tag violation. *Id.* at 1117. After the driver answered questions about his itinerary, none of which caused the officer to suspect criminal activity, the officer then started asking about drugs, including asking whether his drug dog would alert "when" it was walked around the van, and the driver stated the dog should not alert. The driver stated that the only money in the van belonged to the passenger, Peralez, who just closed his bank account. The officer then spoke to Peralez, who confirmed the answers given by the driver, including the one about the drug dog. Ten minutes into the stop, the officer ran both the driver's and passenger's identifications. Although dispatch responded in one minute, before it did, and sixteen minutes into the stop, the officer walked his drug dog around the vehicle, where it alerted. A search of the van resulted in a scale with marijuana residue, a revolver with an obliterated serial number and bullets, all of which Peralez claimed. *Id.* at 1118-19. Although the court found that the traffic stop was unlawfully extended, *id.* at 1121, it nonetheless found that the dog sniff

56

was not the proximate cause of the unconstitutional delay because the officer intended on deploying the dog regardless of the driver's and Peralez' answers. *Id.* at 1121-22.

*Peralez* is distinguishable from this case because objectively, Allen had additional reasonable suspicion following the traffic stop to prolong the detention based on the smell of alcohol and the inconsistencies between Latimore and Moss's answers. The Court recognizes Latimore's argument that, but for Allen's subjective belief that Latimore was involved in the drug trade, the stop would not have been made, the questions would not have been asked and the answers would not have been considered inconsistent, but since Allen had objective justifications for his actions, the encounter is not deemed unconstitutional.

In *United States v. Blair*, 524 F.3d 740 (6th Cir. 2008), the defendant was stopped because the officer believed his tag light was not operational. The court of appeals found that at most, the investigation into the purported tag light violation should have concluded within a few minutes after the defendant's license was found to be valid and he had no outstanding warrants. Instead, the traffic stop was delayed because moments before the traffic stop, another officer had observed and reported that the defendant had driven to a house under investigation for drugs, at which he appeared to engage in a hand-to-hand drug transaction, and upon driving away, rolled through a stop sign.

57

Even assuming the initial reason for the stop was valid, the court held that the stop could not be extended based on the second officer's earlier observations. *Id.* at 752-53. The present case is different because, as noted above, Allen had reasonable suspicion to extend the stop.

In *United States v. Jenson*, 462 F.3d 399 (5th Cir. 2006), the officer pulled the defendant over for speeding. Within a few minutes of the stop, the officer received word from dispatch that the licenses of the defendant and the two passengers were clear. The defendant answered all of the officer's questions; however, the officer perceived that the defendant was becoming increasingly more nervous. The officer issued the driver a traffic warning. Then, the officer again asked the driver where he worked and then asked one of the passengers, the driver's uncle, where he worked because the driver stated he worked with him. The officer thought that the answers were inconsistent because the driver gave the name of the business (which included the uncle's name) while the uncle stated the business did not have a name. After obtaining consent to search the vehicle, the officer told the driver that he needed to frisk him, and the driver became more agitated and accused the officer of harassment and started emptying his pockets; the officer told him to stop and upon searching him found a firearm. *Id.* at 402-03. The court of appeals reversed the district court's denial of the

defendant's motion to suppress, holding that the traffic stop should have ended at the speeding warning, and that there was no articulable suspicion to extend the traffic stop after that event, given that the driver's and uncle's answers were not inconsistent and mere nervousness and a short delay in responding to the officer's directive to pull over did not amount to reasonable suspicion.  *Id.* at 404-05.  Again, the present case is different because Allen objectively had a basis to extend the stop.

In *Boyce*, the Eleventh Circuit reversed the defendant's drug conviction because it held that no sufficient factual basis existed to justify prolonging the traffic stop. *Boyce*, 351 F.3d at 1103.  Boyce was pulled over for driving ten miles per hour under the speed limit and weaving because the officer thought he might be impaired.  Boyce admitted he had just been pulled over for the same infractions, stating that he had been driving since early in the morning and should find a place to sleep for the night.  *Id.* He stated he was driving from New Jersey to Ft. Lauderdale to see his "girlfriend/ex-girlfriend" and was going to return the following Wednesday, which was two days after the rental contract on the vehicle was set to expire.  The officer testified that Boyce was very nervous because he was sweating profusely, and that he was suspicious of Boyce because he talked so much and it was unusual for someone to drive that distance to see an ex-girlfriend, and the discrepancy in the travel plans.  *Id.* at 1104.  The officer told

59

Boyce that he would not be getting a ticket but to go back to his vehicle while the officer looked for his warning book.  *Id.* at 1105.  However, seven minutes later the officer exited his police car and told Boyce to meet him again at the back of Boyce's vehicle, where he returned Boyce's license and told him he was going to get only a warning, but then asked if there were any drugs in the car.  When Boyce stated they were not any, the officer asked if he could search, and Boyce refused.  The officer then called for a drug dog.  While waiting for the dog, the officer thought Boyce was acting as if he was going to flee.  Six minutes later, the officer called in a request for Boyce's criminal history, and six minutes after that request, the drug dog arrived and alerted on Boyce's vehicle's trunk, resulting in the discovery of marijuana and ecstacy pills.  *Id.*

The Eleventh Circuit held that the traffic stop could not be lawfully prolonged in order to run Boyce's criminal history because running Boyce's criminal history was not done as part of a routine traffic stop, but rather only after the officer told Boyce he would receive only a warning.  *Id.*  Moreover, the court held that there was no reasonable suspicion to prolong the stop because the videotape of the stop belied Boyce's nervousness, talkativeness and furtive behavior.  The court also held that once Boyce explained that he was not sure of his status with his ex-girlfriend, any "suspicious inconsistencies virtually evaporated." *Id.* (citation omitted).  It also held

60

that the mere fact that Boyce intended to return the car late did not suggest any criminal behavior and the fact that he was traveling on I-95 ("a known drug corridor") was not sufficient to raise a reasonable suspicion because such a factor would likely apply to a number of persons traveling for perfectly legitimate purposes. Finally, the court held that almost all of the factors relied upon by the officer to create a reasonable suspicion existed before Boyce refused to allow the officer to search, and yet it was only after Boyce exercised his constitutional right that the officer further detained him and called a drug dog. *Id.* at 1110-11.

Again, the present case is distinguishable because Allen had reasonable suspicion to prolong the traffic stop and he requested Latimore's consent simultaneous with serving the traffic violation warnings on Latimore. Allen reasonably could resolve the suspected drinking and inconsistent answers prior to re-entering his vehicle to run a license check, draft the traffic warnings and prepare a consent-to-search form, since the additional reasonable suspicion arose while he was diligently pursuing the investigation prompted by the initial valid reason for the stop.

*Perkins*, 348 F.3d 965, also is distinguishable, because there, the Eleventh Circuit, in addition to recognizing that nervousness and possession of an out-of-state driver's license do not create a reasonable suspicion, held that the driver and

61

passenger's statements were not contradictory but simply different. *Perkins*, 348 F.3d at 971. In the present case, as discussed above, Latimore's and Moss's statements were inconsistent, and the fact that Latimore acknowledged that they had stopped a friend's house after being confronted with that omission does not cure the inconsistency.

*Joshua v. Dewitt*, 341 F.3d 430 (6th Cir. 2003), also is distinguishable because the Sixth Circuit held in that case that a traffic stop could not be prolonged based on a flyer that the defendant was a suspected drug dealer where the flyer was not based on reasonable suspicion. *Id.* at 440. Those facts are not present in this case.

Next, *United States v. Childs*, 277 F.3d 947, 949 (7th Cir. 2002) (en banc), is unhelpful to Latimore because in that case, the court held that questions unrelated to the reason for the traffic stop that do not increase the length of detention or that "extend it by only a brief time" did not render the traffic stop unreasonable. In this case, any increase in duration was so relatively brief so as to not render the detention unreasonable.

Finally, in *United States v. Tapia*, 912 F.2d 1367 (11th Cir. 1990), the Eleventh Circuit held that out-of-state plates, the driver's nervousness and that the vehicle appeared to have few pieces of luggage did not support a finding of reasonable

62

suspicion to prolong the traffic stop.  *Id.* at 1370-71.  In this case, the Court concludes that facts other than Latimore's nervousness gave Allen reasonable suspicion sufficient to prolong the stop.

Thus, Latimore's consent was not tainted by any unconstitutional detention.  As a result, the Court turns to whether the Government satisfied the prerequisites of a voluntary consent.

### 2. *Consent to search*

A search conducted pursuant to consent is another recognized exception to the requirements of probable cause and a search warrant.  *United States v. Harris*, 928 F.2d 1113, 1117 (11th Cir. 1991) (citing *United States v. Baldwin*, 644 F.2d 381, 383 (5th Cir. 1981)).  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice."  *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989).  In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances.  *United States v. Tovar-Rico*, 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996) (illustrating factors properly to be considered in totality of circumstances inquiry).  Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful

AO 72A
(Rev.8/8
2)

authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11ᵗʰ Cir. 1993) (quoting *United States v. Blake*, 888 F.2d 795, 798 (11ᵗʰ Cir. 1989)).  The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent." *Gonzalez*, 71 F.3d at 828  (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)); *see also Florida v. Bostick*, 501 U.S. 429, 438  (1991) ( " 'Consent' that is the product of official intimidation . . .  is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.  *Blake*, 888 F.2d at 798-99.  However, the failure to advise the defendant of his right to refuse to consent will not invalidate an otherwise valid consent to search.  *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11ᵗʰ Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11ᵗʰ Cir. 1999).

AO 72A
(Rev.8/8
2)

The government has the burden of showing, by a preponderance of the evidence, both that there was consent to search and that the consent was voluntary. *Pineiro*, 389 F.3d at 1366. Although the preponderance standard is not as difficult to meet as the reasonable doubt or clear and convincing standard, it "is not toothless," and the government must meet its burden with "reliable and specific evidence." *United States v. Cusick*, --- Fed. Appx. ----, ----, 2014 WL 685437, at *3 (11th Cir. Feb. 24, 2014) (quoting *United States v. Lawrence*, 47 F.3d 1559, 1566 (11th Cir. 1995)).

The Court concludes that Latimore's consent was voluntary. First, as noted above, Allen did not unlawfully extend the traffic stop, but instead had reasonable suspicion to prolong the stop. While any person who has experienced a traffic stop cannot characterize it as "voluntary," in this case since Allen had reasonable suspicion to perform the traffic stop and to prolong the detention, the detention was reasonable for purposes of the Fourth Amendment.

Second, there were no coercive police procedures. The video shows that neither Allen nor any other officer raised his voice to Latimore. No weapons were drawn. No promises or threats were made to Latimore or to Moss. Until after he gave consent, Latimore was not touched, patted down or physically manhandled. While it is true that when Latimore asked what would happen if he refused to search, Allen replied that he

would have one of the officers already present walk his drug dog around the vehicle, courts have held that essentially giving a suspect the choice of consenting or having a drug dog deployed on the vehicle does not render the consent to search involuntary. *See United States v. Polly*, 630 F.3d 991, 999 (10th Cir. 2011) (rejecting claim that officer's statement that he would call a drug-sniffing dog if defendant did not voluntarily consent to search was coercive because "the mere fact that a suspect has to choose between two lawful, albeit distasteful, options does not render that choice coerced"); *United States v. Robinson*, 984 F.2d 911, 914 (8th Cir. 1993) (holding that detective's statement that luggage would be detained for canine sniff did not render defendant's consent to search involuntary); *United States v. White*, 339 F. Supp. 2d 1165, 1168, 1170 (D. Kan. 2004) (holding that officer's statement that defendant could give consent to search or could wait for a drug dog to sniff the vehicle weighed against defendant's claim of coercion because it actually made clear that defendant was not required to provide consent).

Third, Latimore appeared to be very cooperative with the officers.  Although the Government points to Latimore opening the trunk with his remote, that action occurred after he already had consented, so it is of limited value in the consent analysis.  On the other hand, Latimore's conversations with Allen and his body language on the video

66

during his conversations with Chapeau and Kent, and particularly his questioning why Allen wanted to search the vehicle, demonstrate that Latimore was not cowered by the police presence or intimidated into consenting.

Fourth, the consent-to-search form expressly advised Latimore of his right to refuse to consent. Fifth, although the record is silent as to Latimore's education level, he appeared to read the consent-to-search form without assistance and, after the currency was found, indicated that the money was from the sale of houses. These two actions show that Latimore was able to read and was not unsophisticated.

Finally, Latimore was asked and denied whether he had any weapons or anything illegal inside the car. He had no weapons, and possession of currency in and of itself is not illegal. Thus, this factor points toward voluntary consent because Latimore more likely would voluntarily consent if he believed that no incriminating evidence would be found.

Therefore, the Court finds that Latimore voluntarily consented to the search of his vehicle and the fruits of the resultant search could be used and relied upon in subsequent seizure or search warrants.

67

## III.   Federal seizure warrant dated March 19, 2013

In his motion and amended motion to suppress, Latimore complains that the federal seizure warrant for the Corvette was invalid because it was based on the unlawful search of the Corvette on March 4, 2013.[25]  Since the Court recommends that the District Court conclude that the March 4, 2013, search and seizure were lawful, the undersigned **RECOMMENDS** that, to the extent Latimore is challenging the issuance of the seizure warrant, that the motion to suppress the seizure warrant be **DENIED**.

## IV.   State search warrant dated March 26, 2013

The federal seizure warrant for the Corvette was executed on March 26, 2013. Based on observations while law enforcement agents were surveilling Latimore's residence at 2954 Sugarcreek Drive in anticipation of executing the seizure warrant, law enforcement sought an obtained a state search warrant for the Sugarcreek residence. In the application for that warrant, the affiant recounted that during the surveillance Latimore was seen meeting in the driveway of the residence with an individual in an Acura MDX.  Latimore was observed entering the house and bringing out a yellow

---

[25]     He also complained that his wife's statements were unlawfully obtained and that his statements to the police were involuntary.  As noted by the Court in the December 19, 2013, telephone conference, neither contention merited an evidentiary hearing or the suppression of evidence.  Accordingly, the Court **RECOMMENDS** that Latimore's motion to suppress either his wife's or his statements be **DENIED**.

68

plastic bag and placing it in the Acura.  After the Acura left, it was stopped and a search of the yellow bag revealed $34,500 in U.S. currency which the driver, Alexander Cordero, stated were proceeds he received from the sale of an automobile.  Cordero was found to have previously served time for federal drug offenses and a drug dog alerted on the Acura to the presence of drugs.

In addition to stating these facts, the affidavit for the search warrant also discussed the seizure of the $105,860 seized from Latimore on March 4, 2013, including the following details of the HIDTA agents' investigation immediately prior to Allen's traffic stop:

> On March 4, 2013, as a result of Fulton County court·authorized telephone intercept orders, agents learned that Valencia-Zazala would be distributing (3) kilograms of cocaine to another Hispanic male identified as being Victor Castillo, a/k/a "Grenas" ("Castillo") later that afternoon for approximately $35,000 per kilogram.  According  to the intercepted communications, Castillo would, in turn, be distributing the 3 kilograms of cocaine to an unidentified customer.  From the intercepted calls between Valencia-Zazala and Castillo, Castillo indicated that, depending on the price and quality (per kilogram), this same unidentified customer was guaranteed to want at least 2 kilograms of cocaine on a daily basis.

> On March 4, 2013, at approximately 3:30 p.m., agents initiated surveillance activities in the vicinity of 428 Fairhaven Court, Stockbridge, Georgia ("the Fairhaven Court property"), a residence associated with Castillo.

At approximately 5:00 p.m., agents conducting surveillance observed a 2013 Chevrolet Corvette convertible bearing Georgia License tag PCX6091 ("the Corvette") arrive and park at the Fairhaven Court property. Agents observed an unidentified black male, later identified as being Franklin Latimore, entering the residence. Latimore departed the residence at approximately 5:18 p.m. According to the Georgia Department of Motor Vehicles, Georgia License tag PCX6091 is registered to a 2013 Chevrolet Corvette, VIN 1G1YW3DW9D5101797, and in the name of Franklin Latimore of 1973 Barberrie Lane, Decatur, Georgia.

At approximately 5:52 p.m., agents observed Valencia-Zazala arrive at the Fairhaven Court property. A short time later, agents observed Valencia-Zazala and Castillo depart the residence together and then return a short time later with a case of beer. At approximately 7:03 p.m., agents observed Latimore, accompanied by a black female subsequently identified as Latisha Moss, arrive and park the Corvette at the Fairhaven Court property. Both Latimore and Moss entered the residence. From the intercepted telephone calls, agents learned that negotiation for the 3 kilograms of cocaine had broken down and that the transaction would not go through at that time.

At approximately 7:35 p.m., agents observed Latimore and Moss depart the residence, get into the Corvette, and drive from the Fairhaven Court property. A short time later, Georgia State Patrol ("GSP") Trooper Allen initiated a traffic stop of the Corvette for speeding and for failure to maintain lane. Trooper Allen subsequently obtained verbal and written consent from Latimore to search the Corvette. During the traffic stop, Trooper Allen asked Moss if she had anything Illegal in the Corvette, and Moss admitted to having a small amount of marijuana in her purse. During the search, Trooper Allen found in the trunk of the Corvette a plastic bag containing a large amount of U.S. Currency, which was packaged in 19 bundles of small denominations and wrapped in rubber bands in a manner consistent with techniques frequently used by individuals involved in the illegal drug trade. Latimore stated that the

70

U.S. Currency was his and that it was approximately $106,000.  Latimore told the troopers that he paid about $80,000 for the Corvette and that he owed about $13,000 to $14,000.  Latimore further stated that he did not work and that the U.S. Currency was proceeds from the recent sale of two residences.  Trooper Allen seized the U.S. Currency and Latimore and Moss were subsequently released from the scene.

Agents later determined that the U.S. Currency seized from Latimore totaled $105,860.  That amount of currency is consistent with the amount Castillo agreed to pay Valencia-Zazala for the 3 kilograms of cocaine.

A review of Latimore's extensive criminal history revealed an array of arrests and convictions since 1974, including but not limited to forgery, criminal trespass, theft, embezzlement, simple battery, probation violation, as well as numerous drug violations, including arrests for possession of marijuana and for possession with the intent to distribute cocaine (believed to be in March 2000).

[See Doc. 41-2 at 3-4].  The search warrant executed that date at the Sugarcreek Drive residence resulted in the discovery of the firearms charged in Counts One through Three.

In his supplemental motion, Latimore complained that the March 26, 2013, state search warrant was (1) insufficient in that it did not show that the residence was Latimore's house, [Doc. 41 at 5]; (2) based on the earlier warrantless search of the Corvette and that the allegations in the warrant affidavit relating to the March 4, 2013, incident, [Doc. 41-2 at 4]), [Doc. 41 at 5]; and (3) that the information in the warrant application was stale, [id.].  In his post-evidentiary hearing brief, Latimore did not

further challenge the March 26, 2013, warrant.  [*See* Doc. 73].  For the following reasons, the Court concludes that the March 26, 2013, search warrant was validly issued.

First, because the Court has recommended that the District Court find no constitutional infirmity as to the March 4, 2013, warrantless search of the Corvette, the March 26 warrant is not subject to suppression as an unlawful fruit of that earlier warrantless search.

Second, because Latimore did not further challenge the March 26, 2013, warrant in his post-hearing brief, the Court would be authorized to recommend that Latimore abandoned any further challenge to this warrant.

Third, and in any event, search warrants are presumed to be validly issued. *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  The burden of establishing that the warrant in this case was defective or executed improperly is upon the defendant.  *Id.; United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986);  *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B 1981); *United States v. Osborne*, 630 F.2d 374, 377 (5th Cir. 1980).  Latimore did not satisfy this burden.  It is irrelevant that the warrant did not demonstrate Latimore's ownership interest in the Sugarcreek residence; he was observed coming out of the location with a yellow bag that later was

72

found to contain a large sum of currency reasonably appearing to be related to a drug transaction, making it more likely than not that other evidence of Latimore's involvement in the drug business would be located in that residence.

Moreover, the information relating to an investigation a mere 22 days prior to the search warrant is not stale.  To satisfy the probable cause standard, the government "must reveal facts that make it likely that the items being sought are in that place when the warrant issues." *United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994); *United States v. Domme*, 753 F.2d 950, 953 (11th Cir. 1985).  Thus, for probable cause to exist, the information supporting the Government's application for a search warrant must be timely, for probable cause must exist when the magistrate judge issues the search warrant.  *Sgro v. United States*, 287 U.S. 206, 210  (1932) ("[I]t is manifest that the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time."); *Domme*, 753 F.2d at 953; *United States v. Bascaro*, 742 F.2d 1335, 1345 (11th Cir. 1984).  Warrant applications based upon stale information generally fail to establish probable cause that similar or other improper conduct is continuing.  *Harris*, *id.*; *Bascaro*, 742 F.2d at 1345.

The Eleventh Circuit has framed the issue when staleness claims are made, as follows:

AO 72A
(Rev.8/8
2)

When reviewing staleness challenges we do not apply some talismanic rule which establishes arbitrary time limitations for presenting information to a magistrate, rather, we review each case based on the unique facts presented. *Bascaro*, 742 F.2d at 1345; *Domme*, 753 F.2d at 953; *Sgro*, 287 U.S. at 210. In this case-by-case determination we may consider the maturity of the information, nature of the suspected crime (discrete crimes or ongoing conspiracy), habits of the accused, character of the items sought, and nature and function of the premises to be searched. *See United States v. Hooshmand*, 931 F.2d 725, 735-36 (11th Cir. 1991); *Bascaro*, 742 F.2d at 1345; *Cauchon v. United States*, 824 F.2d 908, 911 (11th Cir. 1987); *United States v. Pless*, 982 F.2d 1118, 1126 (7th Cir. 1992); *United States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir. 1992); and *United States v. Rugh*, 968 F.2d 750, 754 (8th Cir. 1992). Ultimately, however, even stale information is not fatal if the government affidavit updates, substantiates, or corroborates the stale material. *See Bascaro*, 742 F.2d at 1346 (additional circumstantial evidence coupled with defendant's preexisting involvement with conspiracy supported probable cause determination). *See also Bucuvalas*, 970 F.2d at 940.

*Harris*, *id.* Thus, "[i]n general, the basic criterion as to the duration of probable cause is the inherent nature of the crime." *United States v. Haimowitz*, 706 F.2d 1549, 1555 (11th Cir. 1983) (internal quotation marks and citation omitted). "[W]here an affidavit recites a mere isolated violation then it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Bascaro*, 742 F.2d at 1345-46 (quoting *Bastida v. Henderson*, 487 F.2d 860, 864 (5th Cir. 1973)); *see also United States v. Bervaldi*, 226 F.3d 1256,

AO 72A
(Rev.8/8
2)

1265 (11th Cir. 2000) ("When criminal activity is protracted and continuous, it is more likely that the passage of time will not dissipate probable cause.") (quoting *Domme*, 753 F.2d at 953).

In the present case, just over three weeks before the events observed at or near the Sugarcreek Lane residence, Latimore was found to be in possession of $105,860 following an aborted drug deal. Then, on the date the search warrant was issued, he was found to have retrieved $34,500 from the Sugarcreek residence and delivered it to an individual with a history of drug transactions. This evidence demonstrates protracted or continuous conduct which rendered the information underlying the warrant timely and not stale. *See Haimowitz*, 706 F.2d at 1554-55 (holding that information regarding the presence of fraudulent documents in defendant's office was as recent as one month before the affidavit was signed; given nature of offense charged and place searched, information in affidavit was not stale); *see also Andresen v. Maryland*, 427 U.S. 463, 478-79 n.9 (1976) (noting three-month time lapse was not unreasonable under the circumstances); *United States v. Sandridge*, 385 F.3d 1032 1036 (6th Cir. 2004) (concluding that information that was three weeks old was not stale where the criminal activity is of an ongoing nature).

AO 72A
(Rev.8/8
2)

Accordingly, the undersigned **RECOMMENDS** that the motion and supplemental motion to suppress the fruits of the March 26, 2013, search warrant be **DENIED**.

## V.      State search warrant dated July 18, 2013

### A.      Facts

On July 18, 2013, at about 1:00 pm, about ten federal agents and task force officers went to the Sugarcreek Lane residence to arrest Latimore on the initial indictment returned in this case charging Latimore with possession of the firearms discovered when the March 26, 2013, search warrant was executed. T73, 78, 99. An unidentified person located in the driveway was detained. T100. The agents observed several males on the back porch of the residence going in and out of the residence through the back door on the porch. T74, 104. At about 1:25 pm, one of those individuals was identified as Latimore. T75. The agents, including TFO Hannan[26] approached the residence once they decided to execute the arrest warrant. *Id.* The screen or security door was closed but the interior door to the kitchen was open,

_____

[26]      As of the time of the hearing, Hannan had been a HIDTA task force member for twelve years, and had been investigating drug cases for fourteen years. During the course of his experience he had become familiar with the smell and appearance of marijuana. T123-24.

76

allowing the agents to see inside the residence.  T76.  Latimore was observed in the kitchen.  T75.  He was told to come outside because the agents had an arrest warrant for him, and he complied.  Once outside, Latimore was secured and moved away from the door but was kept on the back porch.  T76, 102, 105-06.

As the agents had ascended the back porch, they smelled a strong odor of burnt marijuana coming from the residence.  T76-77, 123, 126.  To Hannan, the smell was of recently-burned marijuana, "within five minutes or so before."  T110.  However, Hannan did not see any marijuana smoke.  T110.  Two persons standing in the kitchen, Hilton and Sullivan, were told to exit the house, and they complied.  T77, 108.  A few moments later, Abdullah Latimore walked into the kitchen from the dining room, and he also complied with the directive to exit the house.  T77.  From the porch, about three feet away from his vantage point, Hannan saw what appeared to be partially burnt marijuana cigarettes in an ashtray on top of a microwave sitting on top of a small refrigerator.  T77, 79, 109-10.  Hannan was unable to recall whether he saw the ashtray before or after the persons were taken out of the residence, although he recalled seeing it while Latimore was being handcuffed, which was before the others had left the house.  T79-80.  Task Force Officers Fitzmayer and Gurley entered the residence to perform a security sweep but did not find any other persons.  T77, 78.

AO 72A
(Rev.8/8
2)

Latimore was asked and declined to consent to a search of the house. T80, 112. Hannan and TFO Gilden went to secure a search warrant from a DeKalb County Magistrate. T81, 82. The warrant application process in DeKalb County was electronic, and Gilden had the password to the system. Hannan accompanied him to give the factual background. T82-83. Some of the information which the agents included in the first draft of the application, including background information on the investigation into Latimore's activities, was lost when the agents attempted to save or print the document and thus the application had to be retyped; this background information was omitted from the final version of the application that was submitted to the issuing magistrate. T84, 116-17. Gilden signed the affidavit electronically on a pad in the magistrate's office. T119.

The affidavit in support of the search warrant provided, in material part, that the there was probable cause to believe that the crime of "VGCSA Possession Marijuana 1 oz or less" had been committed at the residence and that the agents sought authorization to search for and seize evidence connected with the crime as described. In support of the warrant, Gilden swore:

Atlanta HIDTA (High Intensity Drug Trafficking Area) Group One was serving an arrest warrant on a Mr. Franklin Latimore with DOB (Date of Birth) of 12/19/1955. While serving the arrest warrant Latimore

78

was located at the threshold of the back deck, which leads to the kitchen. While Latimore was being secured there was a strong odor of burnt marijuana.  Located inside the kitchen there was a small ashtray on a top of a small refrigerator a few feet from the rear day [*sic*].  The ashtray was in plain view.

[Doc. 41-4 at 3].[27]  The DeKalb County Magistrate issued the search warrant for the

Sugarcreek Lane residence at 4:09 p.m., authorizing the search for and seizure of the

following evidence: "Marijuana; Instruments, articles, or things used for the storage,

sale, distribution of marijuana; any writing records or recordings of transactions of

marijuana; any photographs or article reflecting the identity, location or telephone

number of co-conspirators; and any currency or proceeds from the sale of

marijuana."  [Doc. 41-4 at 1].

Hannan gave information orally to the issuing DeKalb County Magistrate,

however, he was not sworn when he provided this information since Gilden was the

---

[27]     The Court notes that the application for the search warrant does not provide that the agents saw marijuana in the ashtray, contrary to Hannan's testimony at the evidentiary hearing.  Given binding case law that the smell of marijuana establishes probable cause to search, *see infra* at 84, and Latimore is not making a *Franks* challenge as to this search warrant, this inconsistency does not alter the Court's ultimate conclusion.

AO 72A
(Rev.8/8
2)

affiant on the supporting application.  T87, 94-95.[28]  On the warrant, the box stating

"Oral testimony not considered" was checked.  [Doc. 41-4 at 4].

Hannan advised agents on the scene that the warrant had been signed.  T97.  The

agents seized the marijuana previously seen in the kitchen; assorted (but not described)

documents located throughout the house; another small quantity of marijuana along

with a loaded Taurus .357 caliber handgun under the mattress in a downstairs bedroom;

and ammunition in a dresser in the master bedroom and closet.  T97-98.

### B.    Contentions of the Parties

In its post-hearing brief, the Government argues that probable cause supported

the issuance of the search warrant despite the fact that the affidavit did not provide a

date of the affiant's observations because the issuing magistrate had knowledge of the

facts of that day's investigation.  [Doc. 69 at 35].  The Government also argues that

even if probable cause did not exist, the July 18 search is saved from suppression by

the good faith exception to the exclusionary rule.  [*Id.* at 35, 41-44].

---

[28]    At the evidentiary hearing, the Court excluded from evidence the content of the conversation between the DeKalb County Magistrate and TFO Hannan.  T96. However, without objection from Latimore, Hannan testified that he told the issuing judge that the events described in the affidavit happened on that date and that other agents were waiting at the house for the warrant to be issued.  T126-27.

80

In response, Latimore argues that the warrant was invalid since, having failed to properly advise the DeKalb County Magistrate of the date when agents smelled and observed marijuana in an ashtray, the warrant was rendered unsupported by probable cause.  [Doc. 73 at 20].  He argues that there is no support for the Government's argument that the Magistrate could rely on unsworn testimony from Hannan.  [*Id.*].  In addition, he argues that there is no argument from the Government that the smell and sighting of burnt marijuana cigarettes in an ashtray allows the issuance of a search warrant for drug records, co-conspirators and the like.  [*Id.* at 21-22].  He also argues that because the warrant was so defective, it is not saved by the good faith exception.  [*Id.* at 23].

In reply, the Government argues that the smell of marijuana authorized a search of the entire residence.  [Doc. 75 at 19 & n.25 (citations omitted)].  The Government also argues that the good faith exception applies even if the warrant was overbroad.  [*Id.* at 20].

## C.    Discussion

The July 18 search presents the following issues: (1) whether the agents lawfully smelled and saw the marijuana in the ashtray, so that the events could be considered by the DeKalb County Magistrate in issuing the search warrant; (2) whether the search

81

warrant was supported by probable cause where the date of the agents' observations was not included in the supporting affidavit; (3) if the warrant was not supported by probable cause, whether Hannan's unsworn statement to the DeKalb County Magistrate that the events described in the affidavit had occurred the same day be considered in considering whether the agents nonetheless could rely in good faith on the warrant as issued; and (4) whether the warrant was supported by probable cause to search for the items identified in the warrant such that, if the agents had good faith to believe the warrant was valid, they lawfully could search the entire residence.

### 1.    *Plain smell/ plain view*

Neither party addresses the issue but the Court concludes that Hannan lawfully smelled and observed the marijuana in the ashtray.  *United States v. Thompson*, 928 F.2d 1060, 1065 (11th Cir. 1991); *see also United States v. Angelos*, 433 F.3d 738, 747 (10th Cir. 2006) (explaining that the plain smell doctrine is a logical extension of the plain view doctrine).  The "plain view" doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent.  *Horton v. California*, 496 U.S. 128, 136-37 (1990); *United States v. Hromada*, 49 F.3d 685, 690 n.11

(11th Cir. 1995).  The agents were properly on the back porch of Latimore's home to execute the federal arrest warrant when they smelled the marijuana.  As discussed below, the smell of marijuana gave rise to probable cause and thus the incriminating character of their observation/scent was immediately apparent.

2.    <em>Probable cause</em>

Probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002).  A "fair probability," in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime.  *United States v. Lopez*, 649 F.3d 1222, 1245 (11th Cir. 2011) (citing *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988)).  Thus, "the information supporting the government's application for a warrant must show that probable cause exists at the time the warrant issues."  *Id.* at 1246 (citing *Bervaldi*, 226 F.3d at 1264).  The task of a judicial officer from whom a search warrant is requested is simply to make a practical, common sense decision of whether, given all the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found

83

in a particular place. *Gates*, 462 U.S. at 238; *United States v. Nixon*, 918 F.2d 895, 900 (11th Cir. 1990). Probable cause deals with probabilities not technicalities. Thus, the judicial officer must consider the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Brinegar v. United States*, 338 U.S. 160, 175 (1949).

There can be no reasonable dispute, and the courts have concluded, that ordinarily, an officer's smelling marijuana establishes probable cause to search the location where the marijuana is located. *United States v. Tobin*, 923 F.2d 1506, 1512 (11th Cir. 1991) (en banc) ("There is no doubt that the agent's suspicions rose to the level of probable cause when, as the door stood open, he detected what he knew from his law enforcement experience to be the odor of marijuana."); *see also United States v. Lueck*, 678 F.2d 895, 903 (11th Cir. 1982) ("[T]he recognizable smell of marijuana gives rise to probable cause supporting a . . . search.").

The question, then, is whether the search warrant was not supported by probable cause because it did not set out the date of the agents' observations. As the Eleventh Circuit recognized in *Domme*, 753 F.2d at 953,

> It does not satisfy the probable cause standard if the government can demonstrate only that the items to be seized could have been found at the specified location at some time in the past. Rather, the government must

> reveal facts that make it likely that the items being sought are in that place when the warrant issues.

*See also Distefano v. United States*, 58 F.2d 963, 964 (5ᵗʰ Cir. 1932) ("The time stated in the affidavit is of the essence of the warrant.  Unless the positive averments of fact show that liquor is illegally possessed at the place to be searched, the further statement of the affiant that he is positive that liquor is there is a mere conclusion without probative force.  We do not think the affidavit in this case, reciting that intoxicating liquor had been purchased ten days before the warrant was served, was sufficient to show probable cause for its issuance to be served in the nighttime.").

Applying these standards, the warrant lacked probable cause because it was not supported by an affidavit which demonstrated that it was likely that the items being sought were in the place when the warrant issued, unless the Court can consider Hannan's unsworn statements to the DeKalb County Magistrate that the agents smelled and observed marijuana on the same date they applied for the warrant.

### 3.    *Hannan's unsworn statements and the good faith exception*

The plain language of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by *Oath or affirmation*. . . ."   (emphasis supplied).   "Probable cause affidavits are not to be supplemented with unsworn

85

statements." *United States v. Parker*, 4 Fed. Appx. 282, 284 (6th Cir. Feb. 8, 2001)

(citing *Tabasko v. Barton*, 472 F.2d 871, 874 (6th Cir. 1972)).  As a result, the unsworn

information provided by Hannan and conveyed to the DeKalb County Magistrate must

be disregarded.  *Id.*  This conclusion is buttressed by the fact that the DeKalb County

Magistrate noted on the warrant itself that oral testimony was not considered.  [Doc. 41-

4 at 4].  To consider Hannan's information to the DeKalb County Magistrate, the Court

would have to ignore both the express language of the Fourth Amendment and the

warrant itself.  The Court concludes it does not have the power to do either.  As a result,

the Court must evaluate the warrant without Hannan's statements to the DeKalb County

Magistrate that the events described in Gilden's affidavit had just occurred.

The Court recognizes that courts have applied the *United States v. Leon*,

468 U.S. 897 (1984), good faith exception where the warrant issued despite the failure

of the issuing magistrate to swear the affiant.  *See United States v. Hessman*,

369 F.3d 1016, 1022-23 (8th Cir. 2004) (finding that law enforcement officers' reliance

on an unsworn and unsigned search warrant was not objectively unreasonable);

*United States v. Callwood*, 66 F.3d 1110, 1113 (10th Cir. 1995) (ruling the exclusion

of evidence is not "the appropriate remedy" for issuing magistrate judge's failure to

administer an oath to officer); *United States v. Kurt*, 986 F.2d 309, 311 (9th Cir. 1993)

AO 72A
(Rev.8/8
2)

(applying *Leon* where officer changed the address for warrant on instructions of judge but was not placed under oath); *United States v. Moore*, 968 F.2d 216, 223 (2d Cir. 1992) (holding "the lack of an oath or affirmation by the presiding officer did not destroy the warrant's final validity"); *United States v. Richardson*, 943 F.2d 547, 548, 550-51 (5th Cir. 1991) (reversing district court's decision to suppress where law enforcement officer had not signed affidavit and magistrate judge did not require oath or affirmation of facts in affidavit); *United States v. Matias*, 836 F.2d 744, 747 (2d Cir. 1988) (rejecting a claim that a warrant was invalid because government agents applying for the warrant were not placed under oath or formally sworn and applying the good faith exception); *United States v. McMillian*, No. 11-CR-193, 2012 WL 273735, at *12 (E.D. Wis. Jan. 27, 2012) (considering *Kurt*, *Richardson*, and *Matias*, and finding that "[e]ven if the judge's failure to place Detective Gomez under oath violated the Fourth Amendment, the error was the judge's, not the detective's.").

Neither party has directed the Court to a case where the information sought to be relied upon was unsworn *and* the warrant expressly provided that the issuing magistrate did not rely upon such unsworn information. Moreover, this case also has the added wrinkle that a person not even listed as the affiant provided unsworn information to the issuing magistrate. These three facts separate this case from the typical *Leon* scenario

87

because the analysis must not only take into account whether the DeKalb County Magistrate "blundered" by not swearing Hannan, *see United States v. Tarazon-Silva*, 960 F. Supp. 1152, 1159 (W.D. Tex. 1997) ("The good faith exception was designed to protect police officers who are generally not schooled on the finer nuances of the law and who therefore should not be held accountable for a magistrate's blunder.") (citation omitted), but also take into account the effect, if any, of the DeKalb County Magistrate's express non-reliance on the unsworn information.

It is elementary that in passing on the validity of a warrant, the reviewing court may consider only information brought to the magistrate's attention. *Giordenello v. United States*, 357 U.S. 480, 486 (1958). The Court concludes that it cannot consider Hanna's unsworn information in deciding whether the warrant was supported by probable cause. To consider such "evidence" in this case would require piling too many exceptions upon one another, rendering the warrant application process perfunctory at best. The Court is unwilling to overlook that many shortcuts in a process that rightly deserves solemnity because the process is designed to protect the privacy of persons in their own homes from the Government's reach.

Nonetheless, the Supreme Court has established a "good faith" exception to the exclusionary rule to prevent suppression of the items found pursuant to a search

88

warrant.  Under *Leon*, 468 U.S. at 913, the "good faith" exception to the rule requiring the suppression of evidence for violations of the Fourth Amendment keeps evidence from being suppressed when law enforcement officers obtain evidence through objective good faith reliance on a facially valid warrant that is later found to lack probable cause.   *See United States v. Gonzalez*,   969 F.2d 999, 1004 n.4 (11th Cir. 1992).  Nevertheless, "it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued."  *Leon*, 468 U.S. at 922-23.  *Leon*'s good faith exception does not apply to the following situations: (1) where the magistrate in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned her judicial role; (3) where the affidavit supporting the warrant is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where, depending upon the circumstances of the particular case, a warrant is so facially deficient - - *i.e.,* in failing to particularize the place to be searched or the things to be seized - - that the executing officers cannot reasonably presume it to be valid. *United States v. Robinson*,  336 F.3d 1293, 1296 (11th Cir. 2003).  Thus, under *Leon*'s third exception, the affidavit must not be a "bare-bones" statement containing nothing

89

more than conclusory allegations.  *See Leon*, 468 U.S. at 915; *United States v. Glinton*, 154 F.3d 1245, 1257 (11th Cir. 1998).   The Government bears the burden of demonstrating the applicability of the *Leon* good faith exception.  *See United States v. Travers*, 233 F.3d 1327, 1331 n.2 (11th Cir. 2000).

Latimore first argues that this case presents the second *Leon* exception because the DeKalb County Magistrate wholly abandoned her judicial role.  [Doc. 73 at 22]. But *Leon* explains that this exception applies only "where the  issuing magistrate wholly abandoned the judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319 [ ] (1979)," *Leon*, 468 U.S. at 923; in *Lo-Ji Sales*, the judge "allowed himself to become a member, if not the leader, of the search party which was essentially a police operation."  *Lo-Ji Sales, Inc.*, 442 U.S. at 327.  While the warrant in the present case might be deficient, there is no evidence that the issuing magistrate abandoned her neutral and detached role in the manner condemned by *Leon* and *Lo-Ji Sales*.  Thus, this argument does not mandate that the Court not apply *Leon*.

As to the application of *Leon*'s third exception, although lacking a date, the Court does not find that the affidavit was so lacking in probable cause as to render official belief in its existence entirely unreasonable.  *United States v. Robinson*, 336 F.3d 1293, 1296 (11th Cir. 2003).  Unlike *United States v. Hython*, 443 F.3d 480, 486 (6th Cir.

90

2006), a case relied upon by Latimore where the good faith exception was found not applicable in part because the affidavit did not disclose when a single purchase of narcotics was made from the defendant's residence, here the affidavit indicated that Latimore was being arrested pursuant to a HIDTA warrant, thus indicating to the issuing judge that Latimore's involvement with controlled substances was not, as in *Hython*, simply a one-off event (even though the indictment was for firearms). Similarly, the relatively brief affidavit contained sufficient detail as to the location of the marijuana and how the affiant came to detect it, and therefore was not a "bare-bones" affidavit that *Leon* does not cover.

Moreover, under the good-faith exception, as interpreted by the Eleventh Circuit, this Court can consider information outside the four corners of the search warrant affidavit to determine whether the officer acted in good faith in relying upon a warrant which might be invalid. *United States v. Martin*, 297 F.2d 1308, 1318 (11th Cir. 2002). In this case, while the Court will not consider Hannan's testimony as to what he told the DeKalb County Magistrate in order to decide if the execution of the search warrant was reasonable (because it was unsworn and the issuing judge disclaimed any reliance upon it), it can consider the sworn testimony presented at the evidentiary hearing that Hannan and Gilden left Latimore's residence soon after smelling and observing the

91

marijuana, sought and obtained the warrant, and caused it to be executed all within a number of hours of the agents' detecting the marijuana in the residence.  Thus, having smelled (and seen) marijuana within three hours of applying for and receiving the warrant, law enforcement could reasonably rely on the search warrant's validity as to probable cause to enter the residence.

### 4.    *Scope of the warrant*

That the Court concludes that the agents had a good faith belief that the warrant was supported by probable cause does not end the inquiry because the warrant did not only authorize the search and seizure of the marijuana smelled or observed in the ashtray.  It authorized a search of Latimore's entire residence for evidence of a conspiracy to distribute marijuana.  Recall that in *Harris*, the Eleventh Circuit recognized that to establish probable cause, the Government must show that it is "likely that the items being sought are in that place when the warrant issues." *Harris*, 20 F.3d at 450 (quotation omitted).  In the present case, the application for the warrant set forth no basis for a belief that in Latimore's residence there likely would be ". . . Instruments, articles, or things used for the . . . sale, distribution of marijuana; any writing records or recordings of transactions of marijuana; any photographs or article

92

reflecting the identity, location or telephone number of co-conspirators; and any currency or proceeds from the sale of marijuana." [Doc. 41-4 at 1].

However, in this case, that is beside the point. Having found probable cause to believe that marijuana was present in the house (or, more accurately, that the agents had a good faith belief under *Leon* to rely on the search warrant that authorized the search of the residence for marijuana), the searching agents were authorized (or had a good faith belief that the warrant authorized them) to search the entire residence for marijuana. "Where a warrant has been issued, 'a lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search." *United States v. Martinez*, 949 F.2d 1117, 1120 (11th Cir. 1992); *United States v. Smith*, 918 F.2d 1501, 1508-09 (11th Cir. 1990) (finding warrant not overly broad and rejecting claim that agents could not search entire premises, including adjacent house, even though small amount of cocaine was sold at pool and could have been concealed on the person of a third-party seller who was merely present at the transaction); *see also United States v. Harbison*, No. 2:10cr140-WKW, 2011 WL 6182112, at *5 (M.D. Ala. Nov. 18, 2011) ("Once the officers had a valid search warrant to search the residence, they were not limited to searching only the

area around which they had seen cocaine.  While the scope of the search is constrained by reasonableness, it was reasonable to believe that illegal substances would be found in other areas in the residence.  . . .  Consequently, the search did not exceed the scope of the warrant, nor did it violate the Fourth Amendment's prohibition on unreasonable searches.") (citing *Martinez*, *id.*) (R&R), *adopted by* 2011 WL 6182404 (N.D. Ala. Dec. 12, 2011).

Thus, pretermitting whether the warrant was overly broad in authorizing the search for evidence of marijuana trafficking,[29] the officers executing the

---

[29]     In some respects, the present case is very similar to *United States v. Vasquez-Padilla*, 330 Fed. Appx. 883 (11th Cir. June 22, 2009) (per curiam).  In *Vasques-Padilla*, an officer responded to an apartment to locate a missing juvenile and entered the apartment once he was advised that the juvenile was inside.  *Id.* at 885.  After the officer entered the apartment, he detected a strong odor of marijuana and observed a small amount of "green marijuana within plain view" and, after the defendant refused consent to search the apartment, the officer applied for and obtained a search warrant for the apartment.  *Id.*  The issuing magistrate was advised of these facts, plus that Vasquez-Padilla previously had been arrested for and convicted of possession of marijuana, as well as the fact that the affiant "had reason to believe that the residence was 'being used to store and distribute marijuana and other illegal substances.' "  *Id.*  The issuing magistrate authorized the officers to search the premises for "marijuana, proceeds of illegal drug trafficking, telephone numbers or photographs related to illegal drug trafficking, [and] illegal drug paraphernalia used to compound harvest, manufacture, store, package, smuggle, transport, distribute, or use/ingest illegal controlled substances."  *Id.* (internal marks omitted).  In his motion to suppress, the defendant argued, among other things, that the search of his apartment was unlawful because "the search warrant affidavit, by relying solely on a general smell of marijuana and the presence of an amount of marijuana suitable for personal use only, did not

94

July 18, 2013, search warrant were authorized to search Latimore's entire residence for

marijuana.  Upon discovery of the Taurus firearm and ammunition in places where

_____

provide the magistrate with a substantial basis for determining whether there was probable cause to believe that he was engaged in a pattern of illegal drug activity." *Id.* at 886.  He also argued that the search warrant was overly broad because it "encompassed all aspects of a drug trafficking operation even though the affidavit did not specifically allege drug trafficking, describe a pattern of criminal activity, or show probable cause for believing that the entire apartment contained evidence of drug trafficking." *Id.*

The Eleventh Circuit upheld the district court's denial of the defendant's motion to suppress based on the defendant's lack of standing to challenge the search, *see id.* at 886-88, but noted that even if the defendant had standing to challenge the search, his arguments with regard to the search warrant were without merit since the allegations in the officer's affidavit that he smelled a strong odor of marijuana and saw marijuana in plain view in an apartment occupied by an individual who previously had been convicted for possession of marijuana provided the magistrate with a substantial basis for determining that "contraband or evidence of a crime" would be found in the apartment, and "even assuming the warrant was overly broad, the officers acted in good faith in relying on the warrant because it was not so overly broad on its face that the executing officers could not reasonably have presumed it to be valid," *id.* at 888 n.4 (citation and internal marks omitted). *See also United States v. Kilgore*, No. 1:11-cr-00518-CAP-RGV, 2012 WL 5334298, at *8 (N.D. Ga. Sept. 13, 2013) (relying on *Vasquez-Padilla* to conclude that officers could rely in good faith on search warrant for evidence of drug trafficking, including seizing cell phones, where the basis for probable cause only was the smell of marijuana) (R&R), *adopted by* 2012 WL 5305146 (N.D. Ga. Oct. 26, 2012).

Because the Court concludes, as discussed in the text,  that the search warrant properly authorized the search of the entire residence for marijuana, the Court need not address whether *Vasquez-Padilla* is persuasive even though that decision is unpublished and the above-discussion about the scope of the warrant is *dicta*.

AO 72A
(Rev.8/8
2)

marijuana reasonably could be stored or secreted (under a mattress, in a bedroom or in a closet), the officers could seize the weapon and ammunition as contraband, since earlier that day they arrested Latimore on an indictment charging him with being in unlawful possession of firearms after felony convictions. *United States v. Franklin*, 694 F.3d 1, 7 (11th Cir. 2012) ("[T]here is no factual dispute that the officers had probable cause [since defendant] was known to be a felon and was observed in plain view in the presence of weapons which he had no right to possess as a convicted felon."); *United States v. Nedd*, 582 F.2d 965, 966 (5th Cir. 1972) (holding that police could look under mattress in executing warrant to search for heroin, and pistol which they saw when they lifted up mattress was properly seized under plain view doctrine); *United States v. Gray*, Criminal Action File No. 1:13-cr-181-TCB, 2013 WL 6178536, at *2 (N.D. Ga. Nov. 25, 2013) (weapon properly seized when it was found in plain view and officers know defendant was convicted felon).

As a result, the undersigned concludes that the good faith exception saves the fruits of the July 18, 2013, search from suppression, and the scope of the search warrant did not violate the Fourth Amendment.

96

## VI.   Conclusion

For all of the above and forgoing reasons, the undersigned **RECOMMENDS** that Latimore's motion and supplemental motion to suppress evidence and statements, [Docs. 22, 41], be **DENIED**.

No other matters are pending before the undersigned in this case.  Accordingly, this case is **CERTIFIED READY FOR TRIAL**.

**IT IS SO RECOMMENDED AND CERTIFIED**, this the  29th  day of May, 2014.

_____
ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

97